JAMES C. HAMRICK AND L. G. HAMRICK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2479–62. Filed October 20, 1964.

*Arthur M. Jenkins*, for the petitioners.
*John L. Ridenour III*, for the respondent.

BRUCE, *Judge:* The respondent determined deficiencies in income

tax for the calendar years 1958, 1959, and 1960 in the amounts of $653.76, $7,257.32, and $90,518.08, respectively.

The principal issue for decision is whether certain shares of stock in a corporation received by James C. Hamrick in the taxable years constituted nontaxable income within the provisions of section 351 of the Internal Revenue Code of 1954 or capital gains pursuant to section 1235 of the Code, as to some of such shares, and ordinary income as to other shares. If the shares are taxable, there is a further issue concerning the valuation of the shares at the times of the distributions. If the shares are not taxable, the petitioners claim a refund for 1959 on the ground that they erroneously reported and paid tax on capital gain for that year. Some facts are stipulated.

### FINDINGS OF FACT

The stipulation of facts and the exhibits thereto are incorporated herein by this reference.

The petitioners are husband and wife, residing at Matthews, N.C. They filed joint Federal income tax returns for the calendar years 1958, 1959, and 1960 with the district director of internal revenue at Greensboro, N.C.

Jet Line Products, Inc., hereinafter referred to as Jet, is a corporation organized under the laws of North Carolina in October 1957, originally as Jet Line Gun Co., Inc. The present name was adopted in December 1959. The stock of this corporation was originally of the par value of $100 per share. This was revised by amendment in August 1959 to the par value of $1 per share.

Prior to April 1957, James C. Hamrick, hereinafter sometimes referred to as the petitioner, was employed as an electrician by an electrical contractor and was also engaged part time in the business of selling and installing radios, intercom equipment, and related products. Owen L. Hensley, who had some experience in electrical work and engineering, worked with Hamrick to develop an idea using a gas-propelled cartridge to carry a lead line through various types of conduits. By April 22, 1957, they had designed and reduced to practice a device to produce this result. They desired to patent and market this invention. They secured the services of William B. Webb and Charles F. Coira, Jr., attorneys, and Arthur R. Newcombe, a financial advisor. An application for a patent was filed July 29, 1957, and a patent for the device was issued in March 1960.

In planning to market the invention, Newcombe located cash investors willing to supply $35,000 for this purpose. Hamrick and Hensley wanted two-thirds of the stock of the proposed corporation while the investors wanted Hamrick's and Hensley's shares limited to 51 percent. A compromise was reached to allow Hamrick and Hensley

each to receive initially slightly more than 25 percent of the issued stock and to allow the issue to them of additional shares up to a total of two-thirds if warranted by earnings and according to an agreed formula. The investors signed a subscription agreement which provided in part:

SUBSCRIPTION AGREEMENT

WHEREAS, it is proposed that a corporation to be called JET LINE GUN COMPANY, INCORPORATED, be organized and incorporated under the laws of the State of North Carolina to engage in the business of manufacturing or contracting for the manufacture of Line Guns as well as to engage in the assembly, distribution and sale of said guns, accessories and equipment and all activities related thereto, said corporation to have an authorized capital stock of One Hundred, Twenty-One Thousand ($121,000.00) Dollars divided into 1,210 shares of the par value of One Hundred ($100.00) Dollars each, and

WHEREAS, the undersigned desire to become owners of stock upon the formation and organization of the proposed corporation :

We, the undersigned, hereby severally subscribe for and agree to take at their par value the number of shares of the capital stock of Jet Line Gun Company, Incorporated set out opposite our respective names and do agree to the terms and conditions hereinafter set out.

It is understood and agreed that 350 shares of said capital stock shall be available for subscription, and that the shares subscribed by the undersigned shall be issued from said 350 shares.

It is understood and agreed that the corporation will purchase from James Hamrick and Owen Hensley all their right, title and interest in and to applications for letters patent and letters patent applicable to that certain device known as the Jet Line Gun. In payment therefor the corporation will issue to Hamrick and Hensley at the time of incorporation 190 shares each of the capital stock of the corporation. As additional payment for such purchase it is agreed that when the net earnings of the corporation at the end of each fiscal year, after provision for taxes, exceed 10 per cent of the par value of the outstanding and issued capital stock of said corporation, additional stock shall be issued to Hamrick and Hensley on the basis of one (1) share each for each one-half (½) per cent of earnings over and above the aforementioned 10 per cent for such fiscal year. Such arrangement shall hereinafter be referred to as the additional stock acquisition plan, and shall continue until they have received the shares hereinafter stated to be available under such plan, or until the expiration of the seventh fiscal year, whichever shall first occur.

It is further understood and agreed that Arthur R. Newcombe shall be issued, at the time of incorporation, ten (10) shares of the capital stock of the corporation as payment for services rendered in connection with securing financial support for the corporation through subscriptions totaling 300 shares, and that Carpenter and Webb, attorneys, shall be issued ten (10) shares of said capital stock at the time of incorporation for legal services in connection with the formation of the corporation.

As additional payment for such services the aforesaid Newcombe and Carpenter and Webb shall each have the option of purchasing at par value additional shares of stock not to exceed twenty (20) shares each or a total of forty (40) shares. Provided, however, that this option shall not be exercised until such time as Hamrick and Hensley have each acquired twenty (20) additional shares of stock under the additional stock acquisition plan hereinbefore set out.

Provided, also, that Newcombe and Carpenter and Webb shall have two (2) years after the acquisition by Hamrick and Hensley of twenty (20) additional shares of stock in which to exercise the option hereinbefore set out.

In the event that the aforesaid option is exercised by Newcombe and Carpenter and Webb, then 205 shares each shall be available for acquisition by Hamrick and Hensley under said additional stock acquisition plan. If said option is not exercised, then 175 shares each shall be available to Hamrick and Hensley under said plan.

It is further contemplated and understood that Hamrick and Hensley shall serve the corporation in the capacity of president and/or vice-president at initial annual salaries of Ten Thousand ($10,000.00) Dollars.

On November 6, 1957, Hamrick and Hensley executed an assignment of their invention to the corporation, providing as follows:

STATE OF NORTH CAROLINA  
*County of Mecklenburg*                                                        ASSIGNMENT

WHEREAS, We, James Hamrick and Owen L. Hensley, of the County of Mecklenburg and State of North Carolina, have made application for Letters patent of the United States on a certain method and apparatus for inserting wires in conduits; and whereas Jet Line Gun Company, Inc., a North Carolina corporation, is desirous of acquiring an interest therein.

Now, THEREFORE, upon the consideration hereinafter set out, we, James C. Hamrick and Owen L. Hensley, by these presents do sell, assign, and transfer unto Jet Line Gun Company, Inc. the full and exclusive right, for the territory of the United States of America, and for all foreign countries, in and to the said invention, as described in the application filed on the 29th day of July, 1957, Serial No. 674930, preparatory to obtaining Letters Patent of the United States therefor; and said invention, application and Letters Patent are to be held and enjoyed by Jet Line Gun Company, Inc. to the full end of the term for which said Letters Patent may be granted, as fully and entirely as the same would have been held by us had this Assignment and sale not been made.

The Assignors do further covenant and agree that they will disclose to the Assignee any and all improvements made by them or either of them with respect to the aforesaid invention and the apparatus used therein, that they will at the cost and expense of the Assignee make application for Letters Patent pertaining to any such improvement or invention as the Assignee shall deem desirable and that they shall assign to the Assignee all of their rights under any such applications or Letters Patent. The obligation expressed herein shall be binding upon the Assignors jointly and severally.

The consideration for this Assignment and Agreement is as follows:

1. Upon the execution hereof the Assignee shall issue to each of the Assignors One Hundred and Ninety (190) shares of its capital stock.

2. Each of the Assignors shall receive from time to time additional shares of the capital stock of the Assignee, the number of which shall be determined thus: At the end of the first fiscal year of the corporate assignee there shall be issued to each of the Assignors one share of the capital stock of the Assignee for each one-half of one per cent by which the net earnings of the Assignee after provision for or payment of taxes exceed 10 per cent of the par value of its issued and outstanding stock before such computation is made, and the Assignors shall receive like distributions of such stock at the end of the second and each succeeding fiscal year of the Assignee upon the earnings in each of such years until there has been issued to the Assignors two-thirds of the issued and outstanding stock of the Assignor, including the shares issued to the Assignor under Paragraph 1 above;

provided, if the Assignors receive hereinunder two-thirds of the then issued and outstanding stock and thereafter additional shares are issued to other persons under option agreements heretofore made by the Assignor, the Assignors may thereafter receive such additional shares as will result in the issue to them of two-thirds of the issued and outstanding stock of the corporation after issue of shares under such option agreements; provided further, however, that no shares shall be issued under this paragraph after the issue, if any, made upon the earnings in the seventh fiscal year of the corporation.

On November 6, 1957, pursuant to the foregoing assignment, Jet issued 190 shares of its capital stock to Hamrick and 190 shares to Hensley, and pursuant to the subscription agreement issued 350 shares to the cash investors for cash in the amount of $35,000, and, for services rendered, 5 shares to Carpenter and Webb, 5 shares to Charles F. Coira, Jr., and 10 shares to Newcombe.

Hamrick was president and Hensley was vice president of Jet.

Because of certain differences which arose, Hensley resigned as an officer of Jet in March 1958. Differences continued during the summer of 1958. In September 1958 Jet's attorney, Webb, discussed with Hensley the possibility of Hensley's selling the 190 shares which had been issued to him, together with his right or rights under the assignment.

On September 26, 1958, Hensley conditionally accepted in writing a proposal by Webb for the purchase of Hensley's 190 shares and right to additional shares plus 16 shares owned by relatives and a friend.

Webb and Newcombe borrowed the funds to purchase Hensley's shares and rights, and on September 29, 1958, Hensley signed a memorandum providing:

### MEMORANDUM OF SALE AND AGREEMENT

The undersigned Owen L. Hensley does hereby transfer and assign unto William B. Webb, individually and as Trustee, the One Hundred Ninety shares of the common capital stock of Jet Line Gun Company, Incorporated, standing upon the books of said Company in his name, together with all of his right and title and interest in and to that certain Assignment dated November 6, 1957, entered into by the undersigned, James C. Hamrick, and Jet Line Gun Company, Incorporated, and particularly all such right as he may now have or ever hereafter have to be issued shares of the stock of said Company under Paragraph 2 of the aforesaid Assignment. The sole consideration for the transfer of the said One Hundred Ninety shares and the right of the undersigned to acquire additional shares under the aforesaid Agreement is the sum of Fifteen Thousand ($15,-000.00) Dollars, the receipt of which is hereby acknowledged by the undersigned.

It is the intent and purpose of this transaction to sever and terminate all relations existing between the undersigned and Jet Line Gun Company, Incorporated, and, in consideration of this purchase by the said William B. Webb, the undersigned does hereby release and forever discharge Jet Line Gun Company Incorporated, its officers, directors, and shareholders, of and from all claims and demands which he now has or ever may hereafter have arising out of transactions occurring before or embraced in this Agreement; provided, however, that this shall not be deemed to effect any rights or controversies between the under-

signed and James C. Hamrick with respect to transactions occurring prior to the organization of said corporation.

The undersigned expressly represents that he has entered into this transaction voluntarily and upon his own business judgment, and that he has not been induced, in whole or in part, to enter into this transaction by any opinion or representation of any officer, director, or stockholder of Jet Line Gun Company, Incorporated.

Hensley resigned as a director of Jet as of the date of the sale.

In October 1958 the directors discussed the disposition of the stock and rights transferred by Hensley. The differences of opinion were resolved at a meeting in October. The minutes of the meeting state, in part:

Pursuant to written notice duly given, a Special Meeting of the Directors of Jet Line Gun Company, Inc., was held at 730 Seigle Street, Charlotte, North Carolina, on Friday, October 28, 1958, at 3:30 p.m. Those Directors present were James C. Hamrick, R. Gray Carrington, Lewis R. Briggs, Arthur R. Newcombe, A. Z. Price, and William B. Webb. President Hamrick presided and called the meeting to order.

     *       *       *       *       *       *       *

Mr. Webb then reported to the meeting on the disposition of the stock acquired from Owen L. Hensley and stated that he had discussed and negotiated the problems arising out of Hensley's rights to acquire additional stock under the patent assignment agreement with both the President and with several of the Directors. He pointed out that while it was desirable and would effect a considerable saving to the corporation and its stockholders for these rights to be retired, the mere retirement of the Hensley rights would benefit all of the stockholders except Mr. Hamrick and would not benefit Mr. Hamrick at all. Mr. Hamrick advised the meeting that he could not tolerate a simple retirement of the Hensley rights and would look upon such action as a violation of his rights under the assignment agreement. Inquiry was made of Mr. Webb, as counsel to the corporation, concerning the law applicable to the controversy and he advised the meeting that it would not be possible to forecast with reasonable certainty the outcome of a suit to determine the rights of Mr. Hamrick, the corporation, and the remaining stockholders. After considerable discussion, it was agreed by all of the directors that the simple retirement of the Hensley rights would be unfair to Mr. Hamrick, if not unlawful, and that to compromise and resolve the dispute, the benefit of the retirement of the Hensley rights ought to be apportioned between Mr. Hamrick and the remaining stockholders and that the assignment agreement ought to be amended accordingly. It was agreed that such a solution would be to the best interest of the corporation in reducing its obligation to issue stock, in preserving its relationship with Mr. Hamrick, and in avoiding litigation.

To carry out the determination of the Directors, upon Motion of Mr. Briggs, seconded by Mr. Price, and unanimously adopted, it was

RESOLVED, that William B. Webb shall assign to this corporation the rights held by him of Owen L. Hensley to acquire additional stock of this corporation under the patent assignment agreement between this corporation and Owen L. Hensley and James C. Hamrick dated November 6, 1957, and that in connection therewith,

(a) The said rights shall be deemed retired and no stock shall be issued thereunder:

(b) The aforesaid patent assignment agreement shall be amended as between this corporation and James C. Hamrick by substituting the following for paragraph numbered 2 in the said assignment agreement:

"The Assignor, James C. Hamrick, shall receive from time to time additional shares of the Capital Stock of the Assignee, the number of which shall be determined thus: at the end of the first fiscal year of the corporate assignee there shall be issued to the said Hamrick one (1) share of the Capital Stock of the Assignee for each one-half of one per cent (1%) by which the net earnings of the Assignee after provision for payment of taxes exceeds ten per cent (10%) of the par value of its issued and outstanding stock before such computation is made, and he shall receive like distributions of such stock at the end of the second and each succeeding fiscal year of the Assignee upon the earnings in each of such years until there has been issued to him hereunder forty-four per cent (44%) of the issued and outstanding stock of the Assignee, including the shares issued to him under paragraph 1 above; provided, that if he receives hereunder 44% of the issued and outstanding stock and thereafter additional shares are issued to other persons under option agreements heretofore made by the Assignee, the said Hamrick shall receive such additional shares as will result in the issue to him of 44% of the issued and outstanding stock after issue of the shares under the option agreements; provided further, however, that no shares shall be issued under this paragraph after the issue, if any, made upon the earnings of the seventh fiscal year of the corporation."

(c) This corporation shall save and hold harmless the said William B. Webb of and from all loss, liability, costs, and expenses or charges of any kind or nature whatsoever (including but not limited to attorneys' fees) arising out of the acquisition by him of the rights of the said Owen L. Hensley or his transfer of the same to Jet Line Gun Company, Inc., or both;

(d) Charles F. Coira, Jr., Secretary of the corporation, be and he hereby is authorized to execute for this corporation an agreement embodying and carrying out the provisions of this Resolution.

Mr. Hamrick stated to the meeting that the terms of the Resolution were acceptable to him and that he would enter into an agreement to carry out the provisions of the Resolution.

In October 1958 various stockholders bought from Webb some of the shares transferred by Hensley.

On November 24, 1958, a memorandum of agreement was executed by Webb, Hamrick, and Jet which transferred to Jet all the right or rights which had been held by Hensley to additional shares of Jet. This agreement further provided, in part:

It is a condition of this agreement that paragraph 2 of the assignment agreement of November 6, 1957, hereinbefore referred to, shall be and the same is hereby amended to read:

"The Assignor, James C. Hamrick, shall receive from time to time additional shares of the Capital Stock of the Assignee, the number of which shall be determined thus: at the end of the first fiscal year of the corporate assignee there shall be issued to the said Hamrick one (1) share of the Capital Stock of the Assignee for each one-half of one per cent (1%) by which the net earnings of the Assignee after provision for payment of taxes exceeds ten per cent (10%) of the par value of its issued and outstanding stock before such computation is made, and he shall receive like distributions of such stock at the end of the second and each succeeding fiscal year of the Assignee upon the earnings in each of such years until there has been issued to him hereunder forty-four per cent (44%)

of the issued and outstanding stock of the Assignee, including the shares issued to him under paragraph 1 above; provided, that if he receives hereunder 44% of the issued and outstanding stock and thereafter additional shares are issued to other persons under option agreements heretofore made by the Assignee, the said Hamrick shall receive such additional shares as will result in the issue to him of 44% of the issued and outstanding stock after issue of the shares under the option agreements; provided further, however, that no shares shall be issued under this paragraph after the issue, if any, made upon the earnings of the seventh fiscal year of the corporation."

It is further a condition of this assignment, and Jet Line Gun Company, Inc., does hereby agree and covenant to save and hold harmless the said William B. Webb of and from all loss, liability, costs, expenses, or charges of any kind or nature whatsoever (including but not limited to attorneys' fees) arising out of the acquisition by him of the rights of said Owen L. Hensley or his transfer of the same to Jet Line Gun Company, Inc., hereunder, or both.

IN WITNESS WHEREOF, the said William B. Webb has hereunto set his hand and seal, James C. Hamrick has hereunto set his hand and seal in token of his acceptance of the provisions hereof; and Jet Line Gun Company, Inc., has caused this instrument to be executed by its duly authorized Secretary, and its seal to be affixed hereunto on the date first above written.

The first fiscal year of Jet ended September 30, 1958. As of that date it issued to Hamrick, pursuant to the assignment as of November 6, 1957, 40.7 shares of its capital stock ($100 par value).

As of September 30, 1959, the stock having been revised by amendment to have a par value of $1 per share, Jet issued to Hamrick, pursuant to the assignment of November 6, 1957, and the agreement of November 24, 1958, 9,824 shares of its capital stock ($1 par value).

As of September 30, 1960, Jet issued to Hamrick, pursuant to the foregoing agreements, 14,910 shares of its capital stock. Of this issue, 8,106 shares brought the total issued to Hamrick to one-third of the total shares issued; 6,804 was thought to be the number to bring his total to 44 percent of the total shares issued. Of this number, 661 were issued to Hamrick by mistake. When discovered, the mistake was corrected by the return of 661 shares.

As of September 30, 1960, Hamrick had received all the shares to which he was entitled under the assignment of November 6, 1957, and the agreement of November 24, 1958.

On November 5, 1958, the petitioner sold three shares of Jet stock ($100 par value) for $300. In September 1959 he sold 600 shares ($1 par value) for $4 per share and 2,000 shares for $3.89 per share. In April 1960 he sold 275 shares for $12.41 per share. In September 1960 he sold 5,000 shares for $14.65 per share to Shuford Mills Co., Inc., a corporation, of Hickory, N.C. In August of 1960 Jet negotiated an agreement with Shuford Mills for the exclusive manufacture of a new product called rigid rope by Shuford Mills for Jet, and the president of Shuford Mills offered to buy the Jet stock for his corporation.

The returns of Jet claimed no deductions for depreciation of the patent on the invention for the fiscal years ended in 1958 or 1959, but claimed a deduction of $1,526.29 for the year ended in 1960. The corporation's returns showed the following:

| Income and expense | Fiscal year ended Sept. 30— | | |
| --- | --- | --- | --- |
| | 1958 | 1959 | 1960 |
| Net sales | $214,715.14 | $415,843.19 | $717,170.26 |
| Less cost of goods sold | 118,054.34 | 197,555.76 | 389,406.65 |
| Gross profit from sales | 96,660.80 | 218,287.43 | 327,763.61 |
| Other income | 20.02 | 765.21 | 1,138.78 |
| Total income | 96,680.82 | 219,052.64 | 328,902.39 |
| Total expense | 58,416.31 | 127,634.78 | 214,878.47 |
| Net income | 38,264.51 | 91,417.86 | 114,023.93 |

The assets and liabilities of Jet as of the end of each fiscal year were as follows:

| | At Sept. 30— | | |
| --- | --- | --- | --- |
| | 1958 | 1959 | 1960 |
| Assets: | | | |
| Cash | $7,601.58 | $13,544.72 | $64,878.20 |
| Trade A/C receivable | 49,603.73 | 113,907.26 | 102,274.36 |
| Inventory | 26,454.02 | 69,731.17 | 82,530.44 |
| Fixed assets | 2,484.10 | 5,427.39 | 29,799.52 |
| Other assets | 47,061.71 | 62,384.24 | 80,370.95 |
| Total | 133,205.14 | 264,994.78 | 359,853.47 |
| Liabilities and net worth: | | | |
| A/C payable | 13,194.24 | 57,837.63 | 61,031.93 |
| Notes payable | 322.00 | | |
| Accrued liabilities | 17,853.95 | 49,160.46 | 65,377.25 |
| Capital stock | 79,070.00 | 88,894.00 | 107,804.00 |
| Retained earnings | 22,764.95 | 69,102.69 | 125,640.29 |
| Total | 133,205.14 | 264,994.78 | 359,853.47 |

The petitioners' original Federal income tax returns showed the following amounts:

| | 1958 | 1959 | 1960 |
| --- | --- | --- | --- |
| Long-term capital gains | | $17,478.80 | $76,663.00 |
| Adjusted gross income | $12,093.92 | 25,820.74 | 60,206.70 |
| Tax | 1,209.56 | 5,961.69 | 19,613.32 |

The petitioners filed an amended return for 1958 in July 1961 to report a short-term capital gain of $300 on the sale of Jet stock which was omitted from the original return. At the same time they filed an amended return for 1959 to correct the basis of stock sold in that year and filed a claim for refund for 1959.

The claim for refund stated:

This claim for refund, supported by an amended U.S. Individual (Joint) Income Tax Return for the year ended December 31, 1959, is filed for the purpose of correcting the taxpayers' original return as it is affected by the accompanying Schedule D, Gains and Losses from Sales or Exchanges of Property.

The taxpayers' Schedule D is corrected in two respects:

(1) The record of sale of two lots of the capital stock of Jet Line Gun Co., Inc., is changed to reflect the taxpayers' cost or other basis as zero. This produces an increase of $2,522.00 in their realized gain on these sales. This change arises from the fact that the taxpayer James C. Hamrick acquired this stock at a zero basis in a tax-free exchange, as set forth in the taxpayers' joint return for the calendar year 1957, as amended.

(2) The gain of $9,824.00 shown on the original return by means of a statement in support of Schedule D, is deleted in the amended return, because the reporting of this gain on the original return is considered erroneous. The sum of $9,824.00 purported to represent gain upon the receipt, by the taxpayer James C. Hamrick, of 9,824 shares of the capital stock of Jet Line Gun Co., Inc., during 1959. Actually these shares were received by the taxpayer with respect to certain rights which he had held in an invention, and which he had transferred to Jet Line Gun Co., Inc. in 1957. The exchange was tax-free and his basis in the rights to the invention was zero at the time of the exchange, as set forth in the taxpayers' income tax return for the calendar year 1957, as amended. The 9,824 shares in question were issued to the taxpayer pursuant to an agreement entered into in 1957, and more fully described in the taxpayers' amended 1957 return.

The effect of the foregoing corrections is to produce an overassessment of income tax in the amount of $1,313.10 for the year ended December 31, 1959:

Income tax per original return_____ $5,961.69
Income tax per amended return_____ 4,648.59

Overassessment_____ 1,313.10

The taxpayers file this claim for refund for the purpose of recovering the overpayment described above, or such greater amount as they may be entitled by law to recover.

The petitioners realized $300 gross long-term capital gain on the sale of stock for that amount in 1958. Their basis in such shares was zero.

The petitioners erroneously reported and paid tax on gross long-term capital gain in 1959 in the amount of $9,824 based on the receipt of 9,824 shares of Jet stock in that year.

The records of a stockbroker at Charlotte, N.C., show the following sales of Jet stock in the period July 1, 1960, to December 31, 1960:

| Date | Number of shares | Price |
|------|------------------|-------|
| July 21 | 100 | 13 |
| July 25 | 500 | 13¼ |
| July 27 | 300 | 13¼ |
| August 5 | 100 | 13¼ |
| August 18 | 25 | 13½ |
| August 25 | 100 | 13¼ |
| September 22 | 100 | 13¾ |
| September 23 | 500 | 15 |
| October 25 | 100 | 14½ |

The records of another stockbroker at Charlotte for the period July through November 1960 show 20 sales of Jet stock in quantities of 25 to 1,300 shares and at prices of from $13.50 to $16 per share. Prices at the end of September were $16 or $15.50. On October 24 a sale of 1,300 shares was made at $15.50.

The fair market value of Jet stock on September 30, 1960, was $14.65 per share.

OPINION

The principal issue involves the taxable status of shares of capital stock issued by Jet to Hamrick in 1958, 1959, and 1960 pursuant to the assignment of November 6, 1957, and the memorandum of agreement of November 24, 1958. The petitioner contends that the provisions of section 351(a)[1] of the Internal Revenue Code of 1954 apply, that all the stock he received was received in exchange for property, and that no gain or loss is to be recognized upon such receipt.

It will facilitate discussion if we treat all the stock involved as of the par value of $1. On this basis, Hamrick received the following amounts at the time stated:

| Year | Shares |
|------|-------:|
| 1957 | 19,000 |
| 1958 | 4,070 |
| 1959 | 9,824 |
| 1960 | 14,249 |

Of the stock received in 1960, 8,106 shares brought the total issued to Hamrick up to one-third of the total issued by Jet, and the additional 6,143 brought his total up to 44 percent of the issued stock. This disregards the 661 shares issued by mistake and returned after discovery of the error, as to which there is no controversy. (These figures and percentages appear inconsistent, but are as stipulated.)

The respondent concedes that the shares petitioner received in 1957 were received in a nontaxable exchange, but takes the position that the next 22,000 shares, received in 1958, 1959, and 1960, bringing the petitioner's total to one-third of the issued stock, represented long-term capital gains under section 1235 of the Internal Revenue Code of 1954, to the extent of the fair market value of the stock, and that the last 6,143 shares received in 1960 are taxable as ordinary income.

The respondent contends that section 351(a) is not applicable because (1) the right to receive the additional shares was neither "stock" nor "securities," (2) the time limitation of "immediately after the exchange" is not satisfied, (3) part of the stock was issued for services

---

[1] SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

to be rendered, and (4) application of section 351 to certain of the shares would result in a tax-free distribution of earnings.

The respondent's first argument is that the right of the petitioner to receive additional stock in Jet was neither stock nor securities within the meaning of section 351(a) but was "other property," which is to be recognized as gain to the extent of its fair market value. Respondent cites *Helvering* v. *Southwest Corp.*, 315 U.S. 194 (1942), in which assets were acquired in a reorganization for voting stock and warrants which allowed the holder to acquire shares of stock upon payment of specified sums. The issue was whether the assets were acquired in a reorganization within the definition in section 112(g)(1) of the Internal Revenue Code of 1939, solely for voting stock. The Court said that "solely" leaves no leeway and that voting stock plus some other consideration does not meet the requirements, and held that the warrants were not voting stock nor did they carry the rights of a shareholder. The respondent says that the petitioner's contract right to acquire Jet stock was not the equivalent of stock but had more of the characteristics of the warrants in the cited case.

The petitioner cites *Carlberg* v. *United States*, 281 F. 2d 507 (C.A. 8, 1960), which involved an exchange of stock for stock and certificates of contingent interest. The issue was whether such certificates were "stock" within the meaning of section 354(a)(1)[2] of the 1954 Code or "other property," within the meaning of section 356(a)(1).[3] The case arose from the merger of two lumber companies, referred to as Maryland and Missouri, into International Paper Co. At the time, Missouri had pending substantial unsettled liabilities. To protect International, certain shares were reserved and certificates of contingent interest issued with respect to them. The stockholders of Maryland and Missouri received shares of International plus certificates. When the liabilities were settled, the reserved shares would be distributed in accordance with the certificates if settlement were made within 10 years. The purpose of the device was to place the ultimate burden of the liabilities on the Missouri stockholders. The court referred to the

---

[2] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

    (a) GENERAL RULE.—

        (1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

[3] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

    (a) GAIN ON EXCHANGES.—

        (1) RECOGNITION OF GAIN.—If—

            (A) section 354 or 355 would apply to an exchange but for the fact that

            (B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money;

then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

*Southwest* case, and observed that there were obvious differences between the warrants in that case and the certificates in *Carlberg*, as the warrants provided rights to purchase at stated prices during a stated time, the holders having only an option to purchase, while the certificate holders were immediately entitled to all the reserved shares to be distributed and need take no positive action nor provide further consideration. The court said that the certificates could produce nothing but stock, that the arrangement for reserved shares seemed an ideal and logical solution of the problem of the contingent liabilities, and that what the holder possessed was either stock or nothing. The court held that the property interest represented by the certificates was "stock" within the meaning of section 354(a)(1) rather than "other property" or "boot."

The contract here was a solution of a problem, as in *Carlberg*. The cash investors were willing to allow Hamrick and Hensley voting control of the corporation to be formed but were unwilling to put up $35,000 for only one-third of the shares in an untried invention. The inventors wanted one-third of the stock each. The arrangement for additional shares to be issued to them in the event the invention proved salable was a compromise and a good faith solution of their differences. There was a valid business purpose in the arrangement. If earnings were meager, the investors would receive in dividends nearly half of them. If the business was successful, they would be content with one-third of satisfactory earnings. The inventors were willing to take the hazard of the salability of their invention which, if successful, would result in their receiving eventually the interests they wanted.

The respondent concedes that the stock issued in 1957 was received in exchange for the transfer of property. The contract right to receive additional stock was also a part of the consideration for the transfer. The right, as in *Carlberg*, can produce nothing other than stock to the petitioner. While the exact number of shares is not specified, what the petitioner can receive is nothing other than stock. Applying the rule of substance over form, we must conclude that the substance of the contract provides for only a stockholder's interest. It does not represent current gain, but additional equity ownership.

In *Carlberg*, the certificates authorized the issue of additional stock if certain conditions were met within 10 years. Here the contract authorized the issue of additional stock if certain conditions were met within 7 years. The stock was authorized and available for issuance if the conditions were met. The principle of the *Carlberg* case is applicable here, and Hamrick's right under the agreement was the equivalent of stock. See also *Philip W. McAbee*, 5 T.C. 1130 (1945), acq. 1946-2 C.B. 4, in which certificates were issued for stock placed in escrow in a reorganization and we held that the stock was received pursuant to a plan of reorganization and at the time of the escrow.

The respondent next contends that the time limitation of section 351 is not met. Under that section gain is not to be recognized if "immediately after" the exchange the transferors are in control of the corporation. The respondent contends that if the transaction is prolonged and spread out over several years it becomes impossible to determine the fact of control within the time limitation of the statute, and that an interval of 7 years within which the petitioner's rights are in abeyance would make the tax effect indeterminable within a reasonable time after the exchange.

The required control is 80 percent of the voting stock. Sec. 368(c). In this case Hamrick and Hensley exchanged their patent rights for 38,000 shares ($1 par value), plus the right to receive additional shares; the cash investors exchanged money for 35,000 shares; and 2,000 shares were issued to others for services. Stock issued for services is not considered as issued in return for property. Sec. 351(a). "Property," for the purpose of section 351, includes "money." *George M. Holstein III*, 23 T.C. 923 (1955). "Immediately after the exchange" the persons who transferred the rights to the patent and the cash, both of which are property, to the corporation were in control of it to the required extent. Hamrick and Hensley and the cash investors held 73,000 shares and the rights to additional shares, while other persons who rendered services, that is, Newcombe and the attorneys, held 2,000 shares, or less than 3 percent. Momentary control is sufficient. *American Bantam Car Co.*, 11 T.C. 397 (1948), affd. 177 F. 2d 513 (C.A. 3, 1949), certiorari denied 339 U.S. 920. The tax effect is determinable immediately. The conclusion is not affected by subsequent issues, even where such issues result in reducing the transferors' control to less than 80 percent, *Lodi Iron Works, Inc.*, 29 T.C. 696 (1958), and we may observe that the right of Hamrick and Hensley to receive additional shares in the future could not possibly reduce the degree of control of the transferors here.

The respondent next contends that at least a part of the additional shares was issued for services rendered or to be rendered by the petitioner, referring to the covenant by Hamrick and Hensley in the original assignment that they would disclose to the corporation and assign to it any and all improvements made by either of them in the invention and all rights under any patents pertaining to such improvements or inventions. The respondent says that this contemplates services by petitioner in working toward improving the invention and that this is a service to be rendered Jet in exchange for the consideration passing from it. Stock issued for services is not considered as issued in return for property, and gain on such stock is not entitled to nonrecognition under section 351(a).

It is an established practice in patent assignments to provide for the assignment of future improvements and similar inventions by the

assignor in order to protect the assignee from having his acquisition made worthless by reason of such improvements. *Aspinwall Manuf'g Co.* v. *Gill*, 32 F. 697 (1887). This is not construed as a contract for services. Hamrick was separately employed by Jet as an officer and was separately compensated for services as such. No part of the stock to be issued to him was intended or may be regarded as compensation for services. He was not hired to invent, as in *Arthur N. Blum*, 11 T.C. 101 (1948), affd. 183 F. 2d 281 (C.A. 3, 1950). Nor was there a provision in the agreement for separate compensation for inventing or promoting and developing inventions, as in *Arthur C. Ruge*, 26 T.C. 138 (1956), nor a provision reasonably to be interpreted as providing for such compensation, as in *Spence* v. *United States*, 156 F. Supp. 556 (Ct. Cl. 1957). The agreement to assign a subsequent improvement does not have the effect of an assignment. See *Roland Chilton*, 40 T.C. 552 (1963). There is no indication that any such transfer was in fact made here.

The respondent further contends that the arrangement was for payments to be made out of future earnings and profits and that such distributions may not be made tax free but represent dividends.

The petitioner points out that the arrangement effected in the assignment was designed to resolve the differences between the cash investors and the inventors. The latter wanted to have two-thirds of the stock divided equally between them. The former were willing to allow Hamrick and Hensley 51-percent control, but not more unless the corporation was successful in marketing the invention. The arrangement to allow the inventors additional stock conditioned upon sales was a solution of these differences. There is no indication that it was designed as a means of distributing dividends in the guise of stock.

The respondent says that the transfer by Hamrick and Hensley is within the provisions of section 1235 [4] dealing with sale or exchange of patents and that petitioner realized long-term capital gains thereunder to the extent of the value of the 22,000 shares issued in 1958, 1959, and 1960. Section 1235 provides for capital gains treatment for transfers of patent rights under certain circumstances.

We have held that section 117(q) of the 1939 Code, which is similar to section 1235 of the 1954 Code, is not the exclusive method of dealing with the transfer of an invention. *Leonard Coplan*, 28 T.C. 1189 (1957). Section 1235 does not have the effect of superseding section

---

[4] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

351(a)(1) where that provision is applicable, as it is here. The respondent concedes that the shares issued in 1957 are within the application of section 351(a) rather than section 1235. These shares were only a part of the consideration for the transfer.

The respondent contends that the last 6,143 shares received by Hamrick in 1960, which increased his stock from one-third to 44 percent of the issued stock of Jet, were received as a dividend and are taxable as ordinary income. The argument is that these shares were not received under the original assignment agreement but under the memorandum agreement of November 24, 1958, that this was not an amendment of the assignment but was a new agreement separate and apart from the assignment of 1957 since the parties were different, as Webb was a party and Hensley was not, and since the consideration was different, being Hamrick's surrender of any cause of action he may have had against the corporation.

The petitioners argue that the 1958 agreement was an amendment of the original assignment. The parties to the original assignment were Jet and Hamrick and Hensley. In 1958 Hensley transferred and assigned to Webb his stock in Jet and all right and title and interest in and to that original assignment. The agreement of 1958 was between Jet and Hamrick and Webb, as assignee of Hensley's rights and interests. The petitioners say that these, being in legal effect the same parties, were therefore competent to amend, and did amend, the original assignment to provide for the issue of additional stock to Hamrick.

When Webb acquired Hensley's stock and rights to additional stock he was acting alone. He had no authority to act for the corporation or for other stockholders except to the extent that Newcombe had assisted in borrowing funds for the acquisition. A dispute arose among the directors as to the disposition of Hensley's stock and rights. Hamrick indicated an intent to resort to litigation. The dispute was settled by the agreement of 1958, in which all of Hensley's rights were transferred to Jet, and Hamrick was accorded the right to receive additional stock up to 44 percent of the shares outstanding. Hamrick had already received full consideration for the transfer of his rights to the patent by the original stock issue and the right to receive up to one-third of the outstanding stock. The sole consideration for the right to receive additional stock up to 44 percent was the surrender of any cause of action he may have had against the other stockholders or the corporation. Although the parties treated this arrangement as an amendment of the original assignment, it was in fact a new agreement based upon new consideration. The additional 6,143 shares were therefore received as ordinary income under section 61 of the Code of 1954.

Since some of the shares received by Hamrick in 1960 constitute

income, we find it necessary to determine the value of the Jet stock at the time of the distribution, on September 30, 1960.

The respondent determined the fair market value to be $14.65 per share. This is the price at which Hamrick sold 5,000 shares to Shuford Mills, Inc., in September 1960. This sale was negotiated in August. The petitioner argues that the sale to Shuford Mills was not an ordinary sale, that Jet had negotiated a contract with Shuford Mills and the stock was bought because of the relationship between the corporations, and that the quantity of 5,000 shares indicates an abnormal sale. The evidence introduced from records of two stockbrokers of Charlotte, N.C., shows sales of smaller quantities of Jet stock in September or October 1960 at prices ranging from $13.75 to $16. This evidence supports the respondent's determination as reasonable and the petitioners have not shown this to be erroneous. We therefore accept that conclusion and find the value to be $14.65 per share as of September 30, 1960.

*Decision will be entered under Rule 50.*

