LANOVA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22682. Promulgated January 16, 1952.

*Allan F. Ayers, Jr., Esq., Howard S. McMorris, Esq.,* and *J. Andrew Crafts, C. P. A.,* for the petitioner.

*Oscar L. Tyree, Esq.,* for the respondent.

**OPINION.**

LeMire, *Judge:* The value, or cost basis, of the Lang inventions both for the purpose of invested capital and the computation of exhaustion deductions is the first and principal issue for consideration.

Respondent's position is that petitioner acquired its rights in the inventions from Vaduz in a nontaxable transaction in exchange solely for its capital stock; that Vaduz in turn acquired them from Lang in a similar transaction; and that, therefore, the cost basis to petitioner is the cost of the rights to Lang, the original transferor. He argues that neither the cost of the inventions to Lang nor their value when acquired by Vaduz has been proven by competent evidence and that, therefore, no basis can be allowed for the patents in petitioner's hands either for invested capital or for amortization purposes.

Petitioner argues that its basis for invested capital purposes under section 718, Internal Revenue Code, is either the cost of the inventions to itself or the cost to Vaduz; that in either case this cost was the market value of its shares of stock or the shares of Vaduz which were paid in exchange for them; and that these shares had a fair market value equal to the value of the inventions, which was not less than $500,000.

We think that the respondent is correct in his contention that petitioner acquired its interest in the Lang inventions at the time of its organization in exchange solely for its stock. The agreement between petitioner and Vaduz called for payment to Vaduz by petitioner of $4,000,000 for the inventions, including all of petitioner's capital stock at a valuation of $1,000,000 and promissory notes for $3,000,000. However, it was agreed that the whole amount of $4,000,000 might be paid in petitioner's capital stock and within less than a year the three notes were redeemed with petitioner's newly issued stock at par value. These notes we think represented an equity interest in the petitioner corporation rather than a bona fide obligation of the petitioner. See *Swoby Corporation*, 9 T. C. 887. Petitioner does not now contend that its rights in the inventions had a value or cost basis to it in excess of $500,000.

Petitioner's acquisition of the rights in the inventions from Vaduz being a nontaxable exchange under section 112 (b) (5) its basis is

the basis in the hands of its transferor, Vaduz. Section 113 (a) (8), (12), (16). Vaduz acquired the patent applications from Lang in exchange for 40 per cent of its capital stock plus $18,000 which it agreed to pay Lang as reimbursement for its expenses in developing the inventions. This was not a 112 (b) (5) transaction in which the property was exchanged solely for stock and the transferor remained in control of the transferee corporation. Wielich, who received 60 per cent of the stock of Vaduz, had no interest in the Lang inventions while Lange, the transferor, acquired only a 40 per cent stock interest in Vaduz. It is, therefore, the cost to Vaduz that must be used as the starting point in determining petitioner's basis for its interest in the Lang inventions.

The cost to Vaduz was $18,000 plus the value of the stock issued to Lang. Since Vaduz had no net assets except the patent applications and $2,000 paid in capital ($20,000 paid in by Wielich less the $18,000 pledged to Lang), the value of its shares depends largely upon the value of the patent applications at that time. No patents had yet been issued to Lang but the inventions were covered by eight German patent applications then on file, and under its agreement with Vaduz the petitioner was entitled to any and all patents which might thereafter be issued relating to those inventions and patent applications. The patent applications were property capable of valuation and assignment. See *Hershey Manufacturing Co.*, 14 B. T. A. 867, affd. (on this issue) 43 F. 2d 298; *Ida I. McKinney*, 32 B. T. A. 450, affd. 87 F. 2d 811. While the evidence as to value is not too satisfactory, we are convinced from the record as a whole that the inventions did have value and that the respondent erred in not allowing petitioner any basis whatever either for invested capital or for exhaustion purposes. On the other hand we think that the value sought by the petitioner of $500,000 is much too high. Other than the opinion of petitioner's expert witness there is not much in the record to support such a value.

Wielich paid to Vaduz 100,000 Swiss francs, approximately $20,000 cash, for 60 per cent of its stock. This would indicate that the total value of petitioner's stock was, in exact figures, $33,333.33, and the value of the shares issued to Lang in exchange for his inventions, 40 per cent, $13,333.33. This amount plus the $18,000 of cash which Vaduz agreed to pay to Lang making a total of $31,333.33 represents the cost, so computed, of the inventions to Vaduz.

It is argued that the capital structure of Vaduz did not reflect the value of the Lang inventions, but was merely an arbitrary figure which Lang and Wielich adopted for their own convenience. However, the evidence before us does not support this contention and does not offer any other means of determining the cost of the Lang inventions to

Vaduz. We have, therefore, found that the cost of the inventions to Vaduz and, therefore, their unadjusted basis in petitioner's hands was $31,333.33. That figure is the amount to be included in petitioner's invested capital under section 718, Internal Revenue Code, and is the starting point for determining the adjusted basis to be used in computing exhaustion deductions on the patents under sections 113 (b) and 114 (b) (1).

No issue has been raised in this proceeding as to the proper method to be used in computing the depreciation on the patents involved, in the event that a proper basis should be established. An approved method of computing the deductions on an interdependent group of patents is to spread the cost or value of the group over the average life of the patents. See *Union Metal Manufacturing Co.*, 4 B. T. A. 287; *Simmons Co.*, 8 B. T. A. 631; *Syracuse Food Products Corporation*, 21 B. T. A. 865; *Prophylactic Brush Co.*, 25 B. T. A. 676.

The additional capital expenditures properly allowable to the patents should be included in the cost basis for the purpose of computing the exhaustion deductions. These expenditures amounted to $9,494.84, of which $5,936.16 related to the Lang patents and $3,558.68 to another group of patents pertaining to certain features of the Lanova engine known as the Fischer patents.

The next issue involves a question of petitioner's right to the deduction of the expenditures made in securing the agreements with its licensees. These expenditures fall into two classes: Those resulting in working contracts which actually produced royalties and those which did not result in producing contracts. There was $47,823.77 of the former and $18,988.25 of the latter class of expenditures during the years 1937 to 1942, inclusive.

The costs of acquiring license agreements such as petitioner had with its licensees are capital expenditures recoverable through amortization deductions spread ratably over the life of the agreements. *Halbert K. Hitchcock*, 4 B. T. A. 273. Since the agreements here were all coextensive with the life of the patents, the amortization deductions should be spread over the same period as the depreciation deductions on the patents.

The expenditures for research and experimental work which did not result in consummated license agreements, amounting to $18,988.25, cannot be capitalized since no equitable asset was acquired. The respondent now concedes that those expenditures are deductible currently as ordinary and necessary business expenses.

The next issue is the deductibility of the legal fees of $24,600 claimed as a deduction in 1942. Respondent's position is that petitioner has not proved the value of the shares of stock which it issued in payment of the fees or established its right to the deduction under section 23 (a).

The evidence before us, although meager, supports petitioner's claim to the deduction. Ordinary legal expenses incidental to the conduction of a business are deductible when paid or accrued. The fact that the legal services here were performed in part in prior years does not prevent the deduction in the year when the fees were actually paid. The evidence is that the firm first presented its bill to the petitioner in April 1942 for services rendered over the period June 1, 1936, to December 31, 1941. There is nothing to indicate that the fees were either payable or allowable prior to that time. In his brief respondent suggests that the fee may have been in part for services in connection with a recapitalization in 1942, and, therefore, a capital expenditure, but the evidence is to the effect that the bill covered services up to December 31, 1941.

The final issue, whether petitioner is entitled to net operating loss and unused excess profits credit carry-overs, depends upon the computation to be made under our disposition of the above issues and will be settled under Rule 50 computation.

*Decision will be entered under Rule 50.*