WILLIAM A. JAMES AND BERYL N. JAMES, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

C. N. TALBOT AND LULA E. TALBOT, PETITIONERS *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3165–67, 5153–67. Filed October 23, 1969.

*Charles W. Knowlton*, for the petitioners.
*Charles B. Sklar*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in income
tax and additions to tax for the year 1963 as follows:

| Docket No. | Petitioners | Deficiency | Addition sec. 6653(a), I.R.C. 1954 |
|---|---|---|---|
| 3165–67 | William A. James and Beryl N. James | $12,400.69 | $620.04 |
| 5153–67 | C.N. Talbot and Lula E. Talbot | 1,811.82 | |

The issue for decision is whether the transaction by which Mr. James
and Mr. Talbot acquired stock in a corporation was taxable or whether
such transaction was tax free under section 351 of the Internal Reve-
nue Code of 1954.[1] The answer to the question thus posed with respect
to each person depends on the determination of whether Mr. James
received his stock in exchange for a transfer of property or as com-
pensation for services.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so
found.

The petitioners William A. James and Beryl N. James are husband
and wife, and the petitioners C. N. Talbot and Lula E. Talbot are
husband and wife. All the petitioners resided in Myrtle Beach, S.C.,
at the time the petitions were filed in this case. They filed their joint

---

[1] All statutory references are to the Internal Revenue Code of 1954.

Federal income tax returns for the calendar year 1963 with the district director of internal revenue, Columbia, S.C.

For many years, Mr. James was a builder, real estate promoter, and developer with offices in Myrtle Beach, S.C. He has held the office of vice president of the National Association of Home Builders and was chairman of the association's Senior Citizens Housing Committee. During 1963, the James Construction Co. was licensed by the State of South Carolina to engage in the business of general contracting.

On January 12, 1963, Mr. and Mrs. Talbot entered into an agreement with Mr. James for the promotion and construction of a rental apartment project, consisting of not less than 50 apartments, the project to conform to Federal Housing Administration (FHA) standards. The agreement provided that on completion of the project the parties would form a corporation to take title to the project. The voting stock in such corporation was to be distributed one-half to the Talbots and one-half to Mr. James, and nonvoting stock was to be issued to the parties "as the equity of each party in the corporation shall be," with the proviso that Mr. James should have the right to purchase up to 50 percent of such stock over a period of years. The Talbots agreed to transfer to the corporation the land on which the apartment project was to be built, such land to be the only asset contributed by the Talbots to the venture. Mr. James agreed "to promote the project * * * and * * * [to] be responsible for the planning, architectural work, construction, landscaping, legal fees, and loan processing of the entire project." The agreement gave him until January 1, 1964, to promote the project and to obtain the necessary FHA commitment and financing, with an option to terminate the agreement if the project became unfeasible or impossible.

After the execution of the January 12 agreement, Mr. James began negotiations to fulfill his part of the contract. He made arrangements with an attorney and an architectural firm to perform the work necessary to meet FHA requirements—development of legal documents, preparation of architectural plans, and the like; and he obtained from United Mortgagee Service Corp. (United Mortgagee), a lender, its agreement to finance the project and a commitment by FHA to insure the financing. Mr. James personally met with the FHA only twice— once in connection with the amount of the commitment and again at the final closing of the loan, after construction of the project was completed in the late summer of 1964. Most of the arrangements necessary to the securing of the loan and the FHA commitment were handled by the attorney, the architectural firm, and United Mortgagee. The attorney's and architect's fees were not paid by Mr. James but were paid out of the proceeds of the construction loan by the corporation subsequently established.

On August 8, 1963, the FHA issued to United Mortgagee a commitment for the insurance of advances in the amount of $850,700 to Chicora Apartments, Inc., for the apartment project sponsored by Mr. James and the Talbots. On August 27, 1963, United Mortgagee sent Mr. James a draft of a proposed agreement to make a first mortgage loan of $850,700 on the Chicora Apartment project in accordance with Mr. James' application for such loan.[2] The proposed agreement also provided that United Mortgagee would advance to Mr. James personally the amount for FHA-required working capital and other specified sums, such advances to be secured by specified portions of the construction loan or mortgage proceeds. Although the record does not reveal whether this proposed agreement was ever executed, the subsequent activities of the parties indicate that some such agreement was consummated. On August 29, 1963, Mr. James executed a promissory note payable to United Mortgagee in the amount of $1,149.03, the amount of the "FHA Commitment Fee." Mr. James signed this note, which was secured by the mortgage proceeds, individually, and as president of Chicora Apartments, Inc., although the corporation had not been created at that time.

On November 5, 1963, Chicora Apartments, Inc. (Chicora), was granted, upon application of Messrs. Talbot and James, a corporate charter, stating its authorized capital stock to consist of 20 no-par common shares. On the same date, the land on which the apartment project was to be constructed was conveyed to Chicora by Mrs. Talbot in consideration for 10 shares of stock. Nine of these shares were issued to Mrs. Talbot, and one share was issued to Mr. Talbot. Chicora's board of directors determined that on the date of this conveyance the value of the real property so transferred was $44,000. Also on November 5, 1963, 10 shares of stock were issued to Mr. James. The minutes of a meeting of Chicora's board of directors held on that date state that those 10 shares were issued to Mr. James in consideration of his "transfer" to the corporation of the "following described property":

1. FHA Commitment issued pursuant to Title 2, Section 207 of the National Housing Act, whereby the FHA agrees to insure a mortgage loan in the amount of $850,700.00, on a parcel of land in Myrtle Beach, South Carolina, more particularly described in Schedule "A" hereto attached, provided 66 apartment units are constructed thereon in accordance with plans and specifications as prepared by Lyles, Bissett, Carlisle & Wolff, Architects-Engineers, of Columbia, South Carolina.

2. Commitment from United Mortgagee Servicing Corp., agreeing to make a mortgage loan on said property in the amount of $850,700.00 and also commitment from said mortgagee to make an interim construction loan in an identical amount.

---

[2] The record does not describe the contents of such application.

3. Certain contracts and agreements which W. A. James over the past two years have [sic] worked out and developed in connection with the architectural and construction services required for said project.

4. The use of the finances and credit of W. A. James during the past two years (and including the construction period) in order to make it possible to proceed with the project.

Thus, as a result of these transactions, Chicora had outstanding all 20 of its authorized shares of stock.

On November 6, 1963, the FHA issued to Chicora its commitment—entitled "Regulatory Agreement for Multi-Family Housing Projects Except Non-Profit and Section 213"—in the amount of $850,700. Under FHA regulations, this commitment could not be issued to an individual, but was required to be issued to a corporation. The $850,700 mortgage was recorded on November 18, 1963.

The apartment project was built by W. A. James Construction Co. Construction was begun in late 1963 or early 1964, and the buildings were completed and occupancy begun on or about July 28, 1964.

The usual procedures were followed with regard to the FHA commitment fee and the FHA working capital. Mr. James acquired the funds for the commitment fee by the note executed by him on August 29, 1963. On November 19, 1963, Mr. James executed two notes in favor of United Mortgagee; the first was for $17,015, the amount of the required working capital, and the second was for $2,126.75. Mr. James received these amounts from United Mortgagee in accordance with FHA requirements. Both notes were to be paid out of the "contractor's cash fee" and were secured by the mortgage proceeds, and each bore the notation of consent of Chicora and W. A. James Construction Co. to the assignment of the contractor's fee. The funds so advanced to Chicora in the credit of Mr. James, including the commitment fee, were to be, and were, repaid out of the initial advances under the FHA guarantees to Chicora. The commitment fee and the working-capital requirement, accordingly, were paid out of the construction loan advance to the corporation.

Both Mr. and Mrs. James and Mr. and Mrs. Talbot deemed their receipt of Chicora common stock to be in return for a transfer of property to a controlled corporation under section 351. Accordingly, neither family reported any income from such receipt on their respective income tax returns for 1963. In his statutory notice of deficiency, the respondent determined that Mr. James received such stock, with a value of $22,000, for services rendered and not in exchange for property, and thus received taxable income in that amount. He further determined that the Talbot's transfer of property to Chicora did not meet the requirements of section 351, with the result that they should have

recognized a long-term capital gain of $14,675—the difference between $7,325, the basis of the land transferred, and $22,000, the value of the stock received.

OPINION

The first, and critical, issue for our determination is whether Mr. James received his Chicora stock in exchange for the transfer of property or as compensation for services. The petitioners argue that he received such stock in consideration of his transfer to Chicora of the FHA and United Mortgagee commitments and that such commitments constituted "property" within the meaning of section 351.[3] The respondent does not appear to challenge the petitioners' implicit assertion that Mr. James was not expected to render future services to the corporation in exchange for the issuance of stock to him. Although the accuracy of this assertion is subject to some question, the state of the record is such that we must decide the issues as the parties have presented them. Thus, the sole question on this issue is whether Mr. James' personal services, which the petitioners freely admit were rendered, resulted in the development of a property right which was transferred to Chicora, within the meaning of section 351.

Section 351(a) provides, in pertinent part:

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transfered to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

The second sentence of this subsection was first included in the statute as a part of the 1954 Code, although it is said merely to restate the case law. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 70 (2d ed. 1966). In explaining the second sentence, the House Ways and Means Committee stated:

In accordance with this provision, such stock or securities received by a person who has rendered or will render services to the transferee corporation would be fully taxable as compensation upon receipt. Your committee does not intend, however, to vitiate the remaining portion of the transaction, through application of this provision. [H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. A117 (1954).]

According to the petitioners' argument, Mr. James, as a result of the services performed by him, acquired certain contract rights which con-

---

[3] The minutes of the November 5 board of directors meeting, set out in our Findings of Fact, state that Mr. James also transferred to Chicora certain agreements relating to architectural and construction services and the "use" of his finances and credit. On brief, the petitioners do not argue that either of these items constitute "property" transferred by Mr. James to Chicora within the meaning of sec. 351. So far as the record shows, Chicora, not Mr. James, directly paid for the architectural and construction services, and it also shows that Chicora received little or no benefit from Mr. James' finances and credit.

stituted property and which he transferred to Chicora. The fact that such rights resulted from the performance of personal services does not, in their view, disqualify them from being treated as property for purposes of section 351. In support of this position, the petitioners refer to situations involving the transfer of patents and secret processes. *James C. Hamrick*, 43 T.C. 21 (1964) ; *Lanova Corporation*, 17 T.C. 1178 (1952) ; *Ralph L. Evans*, 8 B.T.A. 543 (1927) ; Rev. Rul. 64–56, 1964–1 C.B. (Part 1) 133. Cf. *Roberts Co.*, 5 T.C. 1 (1945).

It is altogether clear that for purposes of section 351, not every right is to be treated as property. The second sentence of such section indicates that, whatever may be considered as property for purposes of local law, the performance of services, or the agreement to perform services, is not to be treated as a transfer of property for purposes of section 351. Thus, if in this case we have merely an agreement to perform services in exchange for stock of the corporation to be created, the performance of such services does not constitute the transfer of property within the meaning of section 351.

Although patents and secret processes—the product of services— are treated as property for purposes of section 351, we have carefully analyzed the arrangement in this case and have concluded that Mr. James did not transfer any property essentially like a patent or secret process; he merely performed services for Chicora. In January of 1963, he entered into an agreement to perform services for the corporation to be created. He was to secure the necessary legal and architectural work and to arrange for the financing of the project, and these were the services performed by him. Although he secured the services of the lawyer and the architect, they were paid for by the corporation. He put in motion the wheels that led to the FHA commitment, but it was not a commitment to him—it was a commitment to United Mortgagee to insure a loan to Chicora, a project sponsored by Mr. James. It was stipulated that under the FHA regulations, a commitment would not be issued to an individual, but only to a corporation. Throughout these arrangements, it was contemplated that a corporation would be created and that the commitment would run to the corporation. The petitioners rely heavily on the claim that Mr. James had a right to the commitment, that such right constituted property, and that such right was transferred to the corporation in return for his stock. However, the commitment was not his to transfer; he never acquired ownership of the commitment—he could not and did not undertake to acquire such ownership. The evidence as to the commitment by United Mortgagee to make a loan for the construction of the project is somewhat incomplete, but since all the parties knew that a corporation was to be formed and that the FHA commitment would be made to that corporation, it seems clear that there was no

commitment to loan to Mr. James the funds necessary for the construction of the project. Thus, throughout these arrangements, Mr. James never undertook to acquire anything for himself; he was, in accordance with his agreement with the Talbots, making the preliminary arrangements for the construction of the apartment project. The enterprise would be operated, once the initial steps were completed, by a corporation, Chicora, and everything that was done by him was done on behalf of the contemplated corporation. In these circumstances, it seems clear that Mr. James received his share of the stock in the corporation in return for the services performed by him and that he did not transfer any property, within the meaning of section 351, to the corporation. Cf. *Arthur C. Ruge*, 26 T.C. 138 (1956); *Arthur N. Blum*, 11 T.C. 101 (1948), affd. 183 F. 2d 281 (C.A. 3, 1950).

The facts of this case are substantially similar to those in *United States v. Frazell*, 335 F. 2d 487 (C.A. 5, 1964), rehearing denied 339 F. 2d 885 (C.A. 5, 1964), certiorari denied 380 U.S. 961 (1965). In that case, the taxpayer, a geologist, investigated certain oil and gas properties to be acquired by a joint venture, and he was to receive an interest in the joint venture. However, before any transfer was made to him, a corporation was formed to take over the assets of the joint venture, and part of the stock was transferred to the taxpayer. It was not clear whether the taxpayer acquired an interest in the joint venture which was then exchanged for his share of the stock or whether he acquired the stock directly in exchange for the services performed by him. The court found that, in either event, the taxpayer received compensation for his services. If he received the stock in return for the services performed by him, such stock was taxable as compensation; and he did not transfer any property to the corporation within the meaning of section 351. See also *Mailloux v. Commissioner*, 320 F. 2d 60 (C.A. 5, 1963), affirming on this issue a Memorandum Opinion of this Court.

The next question is whether the Talbots are taxable on the gain realized from the exchange of their land for Chicora stock. Section 351(a) applies only if immediately after the transfer those who transferred property in exchange for stock owned at least 80 percent of Chicora's stock. Sec. 368(c). Since Mr. James is not to be treated as a transferor of property, he cannot be included among those in control for purposes of this test. *Fahs v. Florida Machine & Foundry Co.*, 168 F. 2d 957 (C.A. 5, 1948); *Mojonnier & Sons, Inc.*, 12 T.C. 837 (1949); Bittker & Eustice, *supra*. The transferors of property, the Talbots, did not have the required 80-percent control of Chicora immediately after the transfer, and therefore, their gain must be recognized. This result is inconsistent with the apparent meaning of the second sentence from

the committee report, but the statutory scheme does not permit any other conclusion.

In their petition, the Jameses alleged that the respondent erred in valuing the 10 shares Mr. James received at $22,000. However, they have failed to offer any evidence to establish a different value, and they appear to have dropped this allegation. Accordingly, we sustain the respondent's determination of value.

The Jameses have not assigned as error the respondent's determination of an addition to tax under section 6653(a) for negligence, and, accordingly, such determination must be sustained.

*Decisions will be entered for the respondent.*

---

[1] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.