HENRY L. SABES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sabes v. Commissioner
Docket No. 1411-77.
United States Tax Court
T.C. Memo 1979-465; 1979 Tax Ct. Memo LEXIS 57; 39 T.C.M. (CCH) 521; T.C.M. (RIA) 79465; November 26, 1979, Filed *57 Held, petitioner realized income of $36,731.52 in 1969 when a corporation satisfied his contractual obligation for the purchase of that corporation's stock in consideration for arranging a loan for such corporation; held further, receipt of corporate funds by petitioner in 1970 was a distribution from the corporation resulting in the reduction of the adjusted basis of his interest in that corporation; held further,sec. 6653(a), I.R.C. 1954, additions to tax imposed on deficiencies for 1969 and 1970. Bert M. Gross, for the petitioner. Burns Mossman, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Additions to Tax
Taxable Year
Deficiency
Sec. 6653(a) [1]
1969
$22,804.63
$1,140.23
1970
4,175.88
280.79
1971
3,156.71
157.84
After concessions, [2] the issues remaining for decision are as follows: *59 (1) Whether petitioner realized income in 1969 when a corporation satisfied his contractual obligation for the purchase of that corporation's stock. (2) Whether petitioner realized income in 1970 when he assumed control of corporate funds. (3) Whether the section 6653(a) addition to tax for negligently or intentionally disregarding the rules and regulations should be imposed in 1969 and 1970. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Henry L. Sabes resided in Hopkins, Minnesota, when he timely filed his 1969 and 1970 Federal income tax returns with the Internal Revenue Service at Ogden, Utah, and when he filed his petition in this case. Petitioner was a cash method taxpayer for the years 1969 and 1970. As of February 1968, Armlar, Inc. (hereinafter Armlar), operated the Point Supper Club in Golden Valley, Minnesota. At that time, Larry Hork (hereinafter Hork) and/or Ollie Hork, husband and wife, and Armil H. Grodnick each owned 50 percent of Armlar's stock. Petitioner and Hork had been partners in a business venture and friends for many years. Early in 1968, petitioner began discussions with Hork and Grodnick about acquiring *60 Grodnick's 50 percent interest in Armlar. Grodnick was eager to terminate his association with Hork and to sell his Armlar stock and his interest in the real estate on which the Point Supper Club was located. Grodnick was prepared to relinquish his interest in Armlar if he was relieved of certain Armlar obligations which he had personally guaranteed. On November 19, 1968, an agreement was signed by Grodnick, Hork, Ollie Hork, Armlar, and petitioner pursuant to which petitioner agreed to purchase Grodnick's 50 percent interest in Armlar and the real estate. [3]Grodnick and petitioner agreed on a price of $36,731.52. At this time petitioner gave Grodnick a personal check also dated November 19, 1968, in the amount of $10,944.52. The agreement provided in part as follows: WHEREAS, Grodnick desires to assign his interest in the aforesaid agreement *61 of May 30, 1966, as amended by agreement dated August 2, 1966, and further desires to sell his capital stock in Armlar, Inc., and to transfer his interest in the aforesaid real estate,and WHEREAS, Sabes desires to accept an assignment of Grodnick's interest in the aforesaid agreement, and further desires to purchase Grodnick's capital stock in Armlar, Inc. and Grodnick's interest in the aforesaid real estate, IT IS THEREFORE AGREED AS FOLLOWS: 1. Grodnick agrees, subject to the terms and conditions hereinafter set forth, to assign to Sabes all of Grodnick's right, title and interest under that certain agreement between Grodnick and Horks dated May 30, 1966, as amended August 2, 1966, and further agrees to transfer and assign to Sabes his fifty percent (50%) interest in the issued and outstanding capital stock of Armlar, Inc., and assign to Sabes all of Grodnick's right, title and interest in and to the following described real estate.
* * *
2. The purchase price for all of the foregoing real and personal property to be paid by Sabes to Grodnick shall be the sum of Thirty-six Thousand Seven Hundred Thirty-one and 52/100ths Dollars ($36,731.52) payable as follows: Ten *62 Thousand Nine Hundred Forty-four and 52/100ths ($10,944.52) Dollars payable in cash at the time of execution of this agreement; Balance of Twenty-five Thousand Seven Hundred Eighty-seven Dollars ($25,787.00) shall be payable on or before May 1, 1969, together with interest thereon from the date of this agreement until payment at the rate of seven and one-fourth percent (7-1/4%) per annum. 3. In addition, Sabes agrees to indemnify Grodnick and hold him harmless from all liability with respect to the following obligations: * * *
5. Date of closing shall be May 1, 1969. Upon closing and upon payment of the balance of the purchase price by Sabes to Grodnick, Grodnick shall execute and deliver to Sabes an assignment of his interest in the aforesaid contract of May 30, 1966, and shall further assign, transfer and convey to Sabes all of his interest in the capital stock of Armlar, Inc., and in the above described real estate. * * *
This agreement was supplemented by an undated Addendum, which was executed by the parties in March or April of 1969. The Addendum provided, in part, that $25,000 of the $25,787 payable pursuant to the original agreement would be payable jointly *63 to Grodnck and the Northwestern National Bank of Minneapolis to satisfy a loan which had been obtained by Armlar and personally guaranteed by Grodnick. It further provided that in the event petitioner defaulted on any of the covenants of the original agreement, Grodnick would be permitted to retain as earnest money the $10,944.52 check he received from petitioner. Moreover, petitioner and Armlar agreed to indemnify Grodnick and hold him harmless from any obligation incurred in connection with the business of Armlar or the Point Supper Club arising from and after the date of the Addendum. Prior to November 19, 1968, petitioner, through his friends, was instrumental in arranging a mortgage loan for Armlar from Bankers Capital Life Insurance Company and the Bank of Minneapolis and Trust Company in the amount of $150,000 (loan hereinafter referred to as Bankers Life Loan).On November 13, 1968, the Bankers Life Loan was approved by the Bankers Capital Life Insurance Company and Bank of Minneapolis and Trust Company, and on May 27, 1969, it was closed at the offices of the escrow agent, Title Insurance Company of Minnesota. The Bankers Life Loan was secured by the land and building *64 in which the Point Super Club was operated and which had been transferred by Hork and Grodnick to Armlar about the time of the closing. [4] At the time of the closing, the following distribution was made of the $150,000 loan proceeds for the purposes indicated: Amount
Payee
Purpose $ 424.05
Title Insurance
Title Insurance
Co. of Minnesota
150.00
Title Insurance
Escrow Fees
Co. of Minnesota
35,175.16
E. J. Gluek
To pay off the land contract
for the real estate on which
the Point Supper Club was
located.
37,689.79
Armil Grodnick
Paid, in part, pursuant to the
and Northwestern
provisions of the undated Ad-
Bank of
dendum agreement whereby it
Minneapolis
was agreed $25,000 was to be
used to satisfy a loan owing
Northwestern National Bank by
Armlar, and in part, to pay
Grodnick for the $10,944.52
check Grodnick received from
petitioner on November 19,
1968, which Grodnick returned
uncashed to petitioner at the
closing of the Banker's Life
loan on May 25, 1969. [5]
37,062.85
Armlar
To provide working capital for
Armlar.
11,360.41
Hennepin County,
To pay back real estate taxes.
Minnesota
814.80
Armil Grodnick
Interest
410.70
Bank of Minnea-
Attorney's fees for loan.
polis and Trust
Company
4,045.04
Bruce B. James,
To satisfy an outstanding
Attorney
judgment against Armlar.
22,500.00
Title Insurance
Amount held in escrow by agent
of Minnesota
to satisfy miscellaneous mech-
anic liens or pending actions
367.20
Mortgage registration tax,
mortgage tax stamps, and
recording fees.
$ 150,000.00
*65 Substantially all of the $37,689.79 paid to Grodnick and Northwestern National Bank of Minneapolis at the closing was used to pay two promissory notes of Armlar payable to the Northwestern National Bank of Minneapolis on which Grodnick was liable as a guarantor. Although the undated Addendum to the agreement dated November 19, 1968, required that only $25,000 be paid jointly to Grodnick and Northwestern National Bank of Minneapolis to satisfy a loan of Armlar, Grodnick wanted all the proceeds he was to receive under the original agreement to be used to satisfy *66 Armlar loans at Northwestern National Bank of Minneapolis so that all of his potential personal liability or Armlar debts was paid: On November 22, 1968, petitioner purchased a cashier's check in the amount of $6,691.75. The check was payable to the Director of Internal Revenue for delinquent employment withholding taxes owed by Armlar at that time. On May 31, 1969, the following entries were made in the books of Armlar: Dr. Account "Due to A. Grodnick"
$10,000.00
Dr. Interest - Sabes
700.00
Dr. Due from Officer Account
7,300.00
Cr. Loan Payable H. Sabes
$18,000.00
In November 1970, Title Insurance Co. of Minnesota remitted $5,203.68 to Armlar from the escrow account which was established at the time of the closing of the Bankers Life Loan in the amount of $22,500. Petitioner assumed control of these funds and the check of $5,203.68 was received by Herb Klein, petitioner's brother-in-law. The check was then deposited to the account of Valley West Liquors, Inc., at the American State Bank of Bloomington, Bloomington, Minnesota. Of the deposited proceeds, $3,000 became a part of a loan from petitioner to Melvin Bellman, an associate of petitioner, *67 and in turn a loan from Bellman to Valley West Liquors. In 1970, petitioner had an equity interest in Valley West Liquors. The balance of the proceeds in the amount of $2,203.68 was paid to Herb Klein by a check dated November 24, 1970, drawn on the account of Valley West Liquors, and was converted to cash.
On December 10, 1970, Title Insurance Co. of Minnesota issued a check to Armlar in the amount of $63.03 which represented interest earned on the $22,500 held in the escrow account established at the time of the closing of the Bankers Life Loan. On his tax return for 1970, petitioner reported the $63.03 as interest income from Title Insurance Co. of Minnesota. In the notice of deficiency, respondent claimed petitioner realized income of $36,731.52 n 1969 when Armlar discharged his contractual liability to Grodnick because he either received an interest in Armlar in consideration for arranging the Bankers Life Loan or he received such sum as a finder's fee for arranging that loan. Respondent further determined that the $5,203.68 of Armlar funds paid to petitioner by Title Insurance Co. of Minnesota was income to him in 1970. Finally, respondent imposed the 5 percent addition *68 to tax pursuant to section 6653(a) claiming that petitioner negligently or intentionally disregarded the rules and regulations in 1969 and 1970. OPINION We must decide the following issues: (1) Whether petitioner realized income of $36,731.52 in 1969 when Armlar discharged his contractual liability to Grodnick because he either received an interest in Armlar in consideration for arranging the Bankers Life Loan or he received such sum as a finder's fee for arranging that loan; (2) whether petitioner realized income in 1970 upon receipt of $5,203.68 from the Title Insurance Company of Minnesota which funds had been in Armlar's escrow account; (3) whether the 5 percent addition to tax should be imposed on petitioner's deficiencies for negligently or intentionally disregarding the rules and regulations in 1969 and 1970. As to the first issue respondent claims that petitioner realized income in the amount of $36,731.52 in 1969 when Armlar satisfied his contractual obligation to purchase Grodnick's interest in Armlar. He contends that either Grodnick's 50 percent interest in Armlar or the $36,731.52 used to discharge the contractual liability was a finder's fee for petitioner's *69 efforts in arranging the Bankers Life Loan. Petitioner contends that he never received Grodnick's interest in Armlar because he transferred his contractual right to acquire the interest to Armlar. He claims that in consideration for both arranging the Bankers Life Loan and transferring his contractual right to acquire Grodnick's interest, he merely received the right to acquire a 50 percent nterest in Armlar upon payment of $75,000 from the future profits of Armlar. He argues that since such right was of no value, he did not realize income in 1969. Finding that petitioner did realize income in 1969 when Armlar satisfied his contractual obligation to purchase Grodnick's interest in Armlar, we hold for respondent. Section 61(a)(1) includes in gross income "all income from whatever source derived" including "compensation for services, including fees, commissions, and similar items." The payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer. Old Colony Trust Co. v. Comissioner,279 U.S. 716 (1929); Wall v. United States,164 F. 2d 462, 464 (4th Cir. 1947). If a taxpayer receives an *70 interest in a corporation in return for services performed by him, such interest is taxable as compensation. United States v. Frazell,335 F. 2d 487 (5th Cir. 1964), rehearing denied 339 F. 2d 885 (5th Cir. 1964), cert. denied 380 U.S. 961 (1965); James v. Commissioner,53 T.C. 63 (1969). In support of his contention that he merely received a right to acquire a 50 percent interest in Armlar which was of no value, petitioner refers to an unsigned and undated memorandum of agreement, purportedly between Hork and himself, which the parties stipulated for purposes of identification only. Petitioner and Hork claimed they reached an agreement in November of 1968 which provided, in part, as follows: 1. Armlaw would pay from the proceeds of the Bankers Life Loan the balance of the contract for deed on the real estate where its business was located; 2. Armlar would reimburse petitioner for all amounts petitioner paid to Grodnick or other creditors of Armlar; 3. Petitioner would transfer his interest in Armlar and the real estate back to Armlar; 4. Larry and Ollie Hork would transfer their interest in the real estate *71 back to Armlar; and 5.In consideration of petitioner's efforts in obtaining the Bankers Life Loan, and in further consideration of his agreement to pay the Horks $75,000 from petitioner's half of the profits of Armlar, Horks agreed to sell to petitioner 50 percent of the capital stock of Armlar. Even though Hork's testimony agreed with petitioner's contention, we are not convinced that the purported memorandum of agreement represents what actually transpired among Armlar, Hork, and petitioner. Petitioner and Hork had been not only partners in a business venture but also friends for "many, many years." Their testimony was less than forthright and simply lacked the credibility necessary to persuade us that they entered such an agreement. The record simply does not establish the agreement ever existed. Respondent's position, however, is supported by properly executed contracts which represent a probable sequence of events with respect to Grodnick extricating himself from Armlar, Armlar obtaining needed funds by having pettioner arrange the Bankers Life Loan, and petitioner receiving an interest in Armlar in consideration for arranging such loan. Moreover, Grodnick's transfer *72 of his 50 percent interest in the real estate shortly before the closing of the Bankers Life Loan is of little significance as to whether petitioner acquired an interest in Armlar. Substance, not form, governs our determination. Although the real estate interest was to be transferred by Grodnick to petitioner at the closing of the November 19, 1968, contract, Armlar apparently needed the real estate to secure the Bankers Life Loan which petitioner had arranged. Hork also transferred his interest in the real estate to the corporation. Since Armlar held the real estate petitioner was to receive under the November 19, 1968, contract, these transfers do not convince us petitioner did not realize income of $36,731.52 in 1969 when Armlar discharged petitioner's contractual liability to Grodnick for acquiring his 50 percent interest in such corporation. Accordingly, petitioner, as a cash method taxpayer, should have reported that amount as income in 1969. Sec. 1.451-1(a), Income Tax Regs.
The second issue is whether petitioner received income in 1970 when he assumed control of a check in the amount of $5,203.68 which was remitted by Title Insurance Co. of Minnesota from an escrow *73 account Armlar established at the time of the closing of the Bankers Life Loan.Petitioner contends the receipt of this check was not income in that it constituted the repayment of funds previously advanced by him to Armlar. Respondent argues that petitioner should have reported the amount of the check as income because it represented either compensation from Armlar for services performed or a dividend to him as a shareholder of Armlar. Petitioner's argument that the $5,203.68 was repayment of funds he had advanced to Armlar fails because he did not prove Armlar was indebted to him in any amount. See Delta Plastics Corp. v. Commissioner,54 T.C. 1287, 1291 (1970). He did advance the sum of $6,691.75 for delinquent employment taxes owed by Armlar as shown by a cashier's check he subitted into evidence. This falls short of convincing us, however, that the advanced sum was considered an indebtedness of the corporation rather than a contribution to its capital. Petitioner also claims that he advanced other amounts for which Armlar was indebted to him. Again, the record does not establish that Armlar was indebted to petitioner in any amount. Furthermore, the circuitous *74 manner in which petitioner assumed control of the funds suggests that it was not a simple loan repayment, but more in the nature of attempting to conceal the diversion of corporate funds. Petitioner has the burden of proof, Welch v. Helvering,290 U.S. 111 (1933), Rule 142(a), Tax Court Rules of Practice and Procedure, and by not producing books and records to establish his contention, he has failed to carry that burden. We also do not agree with respondent's contention, that the $5,203.68 was compensation for services performed by petitioner. Besides arranging the Bankers Life Loan for which he received an interest in Armlar, petitioner does not appear to have been anything other than a passive investor in Armlar. The record simply does not support a finding that petitioner was being compensated for rendering services for the benefit of the corporation. We must conclude that the $5,203.68 was a distribution from Armlar to petitioner, the treatment of which depends on Armlar's earnings and profits. Secs. 301(c) and 316(a). Respondent concedes that Armlar had no earnings and profits at the time of the distribution. Therefore, petitioner must reduce the adjusted *75 basis of his interest in Armlar by $5,203.68. Sec. 301(c)(2). Finally, we must decide whether petitioner negligently or intentionally disregarded the rules and regulations in 1969 and 1970, justifying respondent's imposition of the section 6653(a) addition to tax. The burden of proving that the imposition of this addition is erroneous rests upon petitioner. Courtney v. Commissioner,28 T.C. 658, 669 (1957). Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner argues only that if his positions with regard to the two central issues in this case are sustained, the additions to tax should not be imposed. Petitioner has not been sustained as to either issue and has presented no evidence to rebut the presumption of correcctness of respondent's determination. Therefore, the 5 percent addition must be imposed on his deficiencies for 1969 and 1970. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Petitioner apparently has conceded the deficiency and addition to tax respondent determined for 1971 because he did not raise it in his petition to this Court or present any evidence at trial showing such determination was incorrect.↩
3. The agreement also included the assignment of an interest in an agreement of May 30, 1966, amended on August 2, 1966. The record, however, reveals neither the content nor the significance of that agreement so, like the parties in this case, our focus will be on the 50 percent interest in the Armlar stock and in the real estate.↩
4. The land and building is the same real estate referred to in the November 19, 1968, agreement between petitioner and Grodnick.↩
5. It is unclear from the record why the check was in the amount of $37,689.79.It is probable that the amount of $37,689.79 is the pay off figure provided by Northwestern National Bank, and that the difference between the sale price of Grodnick's stock in the November 19, 1968, agreement ($36,731.52) and the total amount Grodnick received at closing ($37,689.79 plus $814.80) represents the interest payable at 7-1/4 percent per annum as required by paragraph 2 of the November 19, 1968, agreement. Respondent, however, determined the deficiency on the basis of the sale price ($36,731.52) in the November 19, 1968, agreement.↩