KENNETH G. and JOAN T. THOMSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thomson v. Commissioner
Docket No. 3278-80.
United States Tax Court
T.C. Memo 1983-279; 1983 Tax Ct. Memo LEXIS 510; 46 T.C.M. (CCH) 192; T.C.M. (RIA) 83279; May 19, 1983. *510 P held 22 percent of the stock of B, an electing small business corporation. P never paid money to B in exchange for the stock nor was B indebted to P at the end of its 1974 taxable year. P claims to have made substantial expenditures on behalf of B. Held, under sec. 1374(c)(2), I.R.C. 1954, as in effect during 1974, P is not entitled to deduct his share of B's net operating loss for its 1974 taxable year, since P failed to prove that his basis in B's stock was other than zero. Ronald T. Murphy, for the petitioners. William R. McCants, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $13,395.50 in the petitioners' income tax for 1974. The issue for decision is whether the petitioners had any basis in their stock in an electing small business corporation so that they could deduct their portion of a loss sustained by such corporation. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Kenneth G. and Joan T. Thomson, are husband and wife who maintained their legal residence in Palm Harbor, Fla., at the time they filed the petition in this case. For the taxable year 1974, they filed a joint Federal income tax return with the Internal Revenue Service Center, Chamblee, Ga. Mr. Thomson will sometimes be referred to as the petitioner. For a number of years prior to and including 1974, Mr. Thomson served as a hardware manufacturers' sales representative. He did business in virtually every city and village in Florida; consequently, his business required *513 extensive travel. During 1973 and 1974, Mr. Thomson was also involved with Blount Development Corporation (Blount). Blount was incorporated pursuant to Florida law on November 27, 1972. Mr. Thomson was initially the executive vice president, treasurer, and a director of Blount. Blount was authorized by its certificate of incorporation to issue 10,000 shares of $1 par value common stock. Three initial shareholders each took 200 shares.Mr. Thomson was not an initial shareholder. No further stock was issued or paid for, and ownership interests in Blount were not determined, until John McCarty contributed to Blount's capital in July 1973. At such time, Blount's shareholders and the number of shares held by each were as follows: Percentage of Common
Number of
Authorized and
Name
Shares
Outstanding
Kenneth Thomson
2,200
22.00
Paul Cheeks
2,200
22.00
John McCarty
2,200
22.00
Michael Crews
1,133
11.33
Peter Spillis
1,134
11.34
Hilario Candela
1,133
11.33
10,000
100.00
John McCarty was the only shareholder who paid money to the corporation in exchange for his shares. Mr. Thomson never paid money to the corporation's capital in exchange *514 for his 22-percent interest. In March 1973, he did pay $30,000 to Blount, but that amount was repaid to him in 1973 after Mr. McCarty was brought into the corporation. Mr. Thomson also paid $1,500 on behalf of Blount to its attorneys, and it repaid that amount to him. Blount used a taxable year ending on August 31, and we shall identify a taxable year by the calendar year in which it ended. In September 1973, Blount elected to be treated as a small business corporation within the meaning of section 1371 of the Internal Revenue Code of 1954, [1] effective for its 1974 taxable year; this election was accepted by the Commissioner on November 21, 1973. Blount was formed to take advantage of real estate development opportunities which Mr. Thomson and his son-in-law, Paul Cheeks, believed would result from the construction of a large nuclear power plant in Jacksonville, Fla. During 1973 and 1974, Blount became involved in several real estate projects, including a condominium and an industrial park in Lake Wales, Fla. Mr. Thomson *515 was involved in seeking real estate opportunities for Blount. In addition, he was also involved in attempts to locate equity capital and debt financing for Blount projects. These activities required his presence at various locations throughout Florida. Mr. Thomson sometimes engaged in hardware sales business and Blount business during the same trip. While vacationing in Costa Rica in 1972, Mr. Thomson purchased a residential lot on a golf course.He also met some local businessmen who agreed to enter into a partnership with Blount for the development of a Costa Rican fishing resort. In May 1973, Mr. Thomson again went to Costa Rica. He, possibly accompanied by his wife and children, took vacations in Costa Rica during 1973 and 1974. The Thomsons deducted $300 for "sales exp. (Costa Rica, etc.)" as a nontravel hardware selling expense on their return for 1973. Mr. McCarty's wife was Mrs. Thomson's twin sister.After Mr. McCarty became involved in Blount, the McCartys moved to Lake Wales, Fla. Paul Cheeks and his family also lived in Lake Wales, and the Thomsons occasionally visited them there. Mr.Thomson kept a daily log in which he recorded the expenditures for meals, *516 lodging, and transportation incurred by him while engaged in hardware sales. However, he did not keep a log for expenditures related to Blount activities. He accumulated in the back of his logbook his receipts for payments made in cash or charged. When he needed cash while traveling, Mr. Thomson cashed checks on his wife's household checking account. During 1973 and 1974, Mrs. Thomson kept the family books reflecting both personal and business expenditures. She maintained a disbursements journal in which she recorded family payments. Such payments were made by checks drawn on the household account. The columns of each page of such journal were marked with the names of different accounts, such as travel, auto, and office. Mrs. Thomson debited a particular account by entering a payment in the appropriate column. She debited the travel account with information she obtained from Mr. Thomson's logbook, receipts, and credit card bills. During 1973 and 1974, Mrs. Thomson also maintained a general journal in which she entered the total debits to each account for each month. During those years, all amounts which were debited to the travel account in the disbursements journal and *517 carried over into the general journal were deducted as hardware business travel expenses on the Thomsons' returns for such years. However, in 1973, Mrs. Thomson reduced total debits to the travel account by $452.53, an amount which she believed represented credit card charges unrelated to business travel. The Thomsons deducted the following expenses related to the business use of automobiles during 1973 and 1974: 1973
1974
Depreciation
$3,762
$1,913
Lease expense
1,520
982
Rental car
559
Auto expense
2,001
1,779
The 1973 depreciation was composed of depreciation of $2,487 for a 1972 Ford "T-Bird" (sold in 1973) and of $1,275 for a 1973 Ford (acquired in June 1973). The 1974 depreciation was entirely attributable to the 1973 Ford. On a financial statement dated August 29, 1973, Mr. Thomson disclosed that he owned a 1972 T-Bird, a 1972 Ford wagon, and a 1970 Camaro; no mention was made of a 1973 Ford. On their 1974 return, the Thomsons listed the cars for which they claimed a gasoline tax deduction as a "Big Ford," a Mustang, and a Triumph. On a financial statement dated January 15, 1975, Mr. Thomson disclosed that he owned a 1974 Ford LTD, a *518 1970 Triumph, and a 1972 Ford Wagon; again, he failed to mention a 1973 Ford. Blount provided company cars for its working officers, and it paid travel, entertainment, and automobile expenses incurred by corporate officers and employees during its taxable year 1974. Blount had credit cards for some of its employees, but Mr. Thomson did not use them. Blount reimbursed him for expenses totaling between $60 and $80, but he was not reimbursed for any other expenses that he may have incurred on behalf of Blount. On its amended corporate income tax return for its taxable year 1974, Blount claimed a net operating loss of $121,697. On their joint return for 1974, the petitioners deducted $26,773 as their proportional (22 percent) share of Blount's loss. In his notice of deficiency, the Commissioner determined that the petitioners' adjusted basis in the Blount stock, plus their adjusted basis in any loans to Blount, was zero. Accordingly, he disallowed the petitioners' deduction for their share of Blount's net operating loss. Sec. 1374(c)(2). In his amended answer, the Commissioner alleged that the petitioners' share of Blount's net operating loss, computed without regard to the *519 limitations contained in section 1374(c)(2), was $21,578. OPINION The issue for decision is whether the petitioners may deduct their share of a loss suffered by Blount. Prior to amendment by the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, section 1374(b) allowed a shareholder of an electing small business corporation to deduct from his gross income, for his taxable year in which or with which the taxable year of the corporation ended, an amount equal to his portion of any loss sustained by such corporation in its taxable year. The shareholder's portion of the loss was determined under section 1374(c)(1) by allocating the loss among the shareholders in proportion to their ownership of the stock for the portion of the year during which they held such stock. However, the loss deduction was limited by the provisions of section 1374(c)(2), which provided, insofar as here relevant, that the shareholder's deductible portion of the loss could not exceed the sum of the adjusted basis of his stock as of the close of the corporation's taxable year and the adjusted basis of any indebtedness owed to him by the corporation at such time. Haber v. Commissioner,52 T.C. 255, 264 (1969), *520 affd. per curiam 422 F. 2d 198 (5th Cir. 1970); Perry v. Commissioner,49 T.C. 508, 519 (1968); see sec. 1.1374-1(b)(4), Income Tax Regs.The petitioner must prove that, on August 31, 1974, he had a basis greater than zero in the Blount stock in order to be entitled to deduct any portion of his share of Blount's net operating loss. Rule 142(a), Tax Court Rules of Practice and Procedure[2]; Welch v. Helvering,290 U.S. 111 (1933); Haber v. Commissioner,52 T.C. at 264.
Ordinarily, the basis of property is initially determined by its cost, that is, the amount paid for such property in money or other property. Sec. 1012; sec. 1.1012-1(a), Income Tax Regs. However, in this case, the petitioner did not pay any money or other property to Blount in exchange for his 2,200 shares. Nor was Blount indebted to him on August 31, 1974; the amounts which he advanced to Blount in 1973 were returned to him, and he does not rely on such payments to establish his basis in Blount. The petitioner's *521 testimony indicated that his shares may have been issued to him, at least in part, in exchange for his services in promoting Blount and obtaining financing for it. If the stock was issued to him as compensation for services rendered by him, then its fair market value was income taxable to him and became the basis of the stock in his hands. United States v. Frazell,335 F. 2d 487 (5th Cir. 1964); James v. Commissioner,53 T.C. 63, 69 (1969); Torrens v. Commissioner,31 B.T.A. 787, 795 (1934). However, the corporate books and records reveal no such arrangement, and the petitioner presented no evidence regarding the fair market value of his Blount stock. In addition, he did not report the fair market value of the stock as income in the year he received it. If the petitioner intended to claim that he had a basis in the Blount stock attributable to his performance of services for Blount, he has utterly failed to prove his right to a deduction based on such claim. [3]
*522 The petitioner's main argument posits a different source for his basis in the Blount stock. He claims that from January 1973 through August 1974 (the end of Blount's taxable year) he was actively promoting Blount's interests, seeking financing and development opportunities.He asserts that he traveled extensively in pursuit of these objectives and that he incurred numerous travel expenses which he paid from his own funds and for which he was not reimbursed.The petitioner contends that these expenditures were contributions to Blount's capital, i.e., the means by which he paid for his stock, and that when such expenditures are accounted for, he had a sufficient basis in the Blount stock to fully absorb his share of Blount's net operating loss for its 1974 taxable year. The Commissioner asserts that the petitioner has failed to substantiate his travel expenses and has failed to prove that any such expenses were incurred on behalf of Blount. He also contends that the petitioner has already deducted as hardware sales expenses the expenses he may have incurred on Blount's behalf. The petitioner bears the burden of proving that he incurred the claimed expenditures, that they were paid *523 to protect or enhance the value of his investment in Blount, and that they were contributions to Blount's capital. Rule 142(a); see, e.g., Koree v. Commissioner,40 T.C. 961 (1963); Kaplan v. Commissioner,21 T.C. 134 (1953); Eskimo Pie Corp. v. Commissioner,4 T.C. 669 (1945), affd. per curiam 153 F. 2d 301 (3d Cir. 1946) (these cases denied a deduction for expenses incurred or payments made by a stockholder on behalf of the corporation, because such expenses or payments were not attributable to a trade or business of the stockholder; in dicta, the cases indicated that such payments may be contributions to capital or loans). The petitioner has produced very little evidence to substantiate the claimed expenditures. He asserts that the Commissioner is responsible for his inability to substantiate his Blount expenditures. The petitioner claims, on brief, that he threw out all his receipts for 1973 and 1974 because Revenue Agent David Laderer told Mrs. Thomson that such records need only be kept for 3 years. However, the petitioner testified that he destroyed all his Blount records after Blount failed because he *524 "did not want to hear any more about Blount ever again" and that advice from the Commissioner did not influence his action. Neither Mr. Nor Mrs. Thomson could remember when they disposed of the records. Finally, Agent Laderer testified that when asked by taxpayers how long records should be kept, his standard response included advice to retain basis records indefinitely. Although the Thomsons may have disposed of some receipts, the Commissioner can in no way be held responsible for their lack of substantiation. The petitioner relied on a schedule containing the month and year, purpose, destination, and estimated travel expenses incurred for each trip or group of trips which he claims to have taken on Blount's behalf from January 1973 through August 1974. He prepared the schedule during 1980, after the filing of the petition in this case. Since the Thomsons had disposed of most of their travel expense records (logbooks, receipts, and bills) prior to 1980, and since the petitioner had never kept a log for his Blount activities and expenditures, his schedule was based on his memory of trips and expenditures which allegedly occurred 6 to 7 years earlier. The expense entries consist *525 of the petitioner's estimates concerning the number of trips, actual auto mileage (at 20 cents per mile), plane fares, car rentals, hotels, and meals. Almost all of the expenses are entered in even or round amounts, and several of the entries are merely unitemized daily totals. The petitioner testified, "Well, as I say, this entire list was done to the best of my knowledge or memory. There is nothing factual I have to go with that or -- I may have spent those three nights there or the four nights there and should have charged hotels. I don't really know." The final entry on the schedule was $25,000 for "additional amount of expenses for which Mr. Thomson does not have specific recollection of the instance of expenditure." The petitioner claimed that this amount represented his cash payments for meals and entertainment provided to people from whom he was soliciting financial assistance for Blount.The schedule lists total expenditures of $47,558 on behalf of Blount. The petitioner's testimony regarding the travel expenses incurred by him on Blount's behalf was based entirely upon the schedule. To such schedule, the petitioner appended what little documentation he possessed. Many *526 of the documents are letters or agreements which, while pertaining to Blount, do not reflect any travel expenses. He did include some copies of receipts, bills, and credit card statements. Most of these documents are American Express receipts and statements, and such documents may include charges that the petitioner incurred in his hardware sales business. The quality of the copies is generally poor; some are completely illegible. The total amount shown by the legible or partially legible receipts which represent Blount expenses claimed on the schedule is less than $1,000. We are not convinced that the petitioner incurred any travel expenses which should be treated as contributions to Blount's capital. His schedule was prepared years after the occurrence of the expenses which it purports to document. He never maintained a diary of the alleged Blount trips and expenses; he testified that he only kept receipts. By his own admission, the petitioner did not keep contemporaneous records as detailed as his schedule, and we do not believe that he could produce such a schedule from memory with any accuracy. The final entry on the schedule is $25,000 cash for meals and entertainment, *527 but the petitioner cannot remember spending any specific portion of such amount. Moreover, the petitioner was able to substantiate only a small portion of the travel and entertainment expenses, and we are not convinced that he ever maintained sufficient records to substantiate a larger portion of such expenses. The substantiation requirements of section 274(d) may not be literally applicable to the present case since the petitioners do not claim that such expenditures are directly deductible under section 162 or 212. Nevertheless, we remain cognizant that travel and entertainment expenses are of such nature as to afford considerable opportunity for abuse, and it is not too much to ask of a taxpayer seeking to prove them that he offer reasonably satisfying proof not only that the expenses were in fact incurred, but also that such expenses were in fact incurred on behalf of the corporation. See Hearn v. Commissioner,36 T.C. 672, 674 (1961), affd. 309 F. 2d 431 (9th Cir. 1962); Walet v. Commissioner,31 T.C. 461, 471 (1958), affd. per curiam 272 F. 2d 694 (5th Cir. 1959). The petitioner's testimony, based on a schedule *528 prepared from memory years after the alleged expenditures were incurred, is not "satisfying proof" in light of the circumstances of this case. The questions and uncertainties that may arise when there is a lack of contemporaneous records to substantiate travel and entertainment expenses are well illustrated in this case. The testimony of Mr. and Mrs. Thomson concerning the total amounts spent on behalf of Blount was not consistent. At various times, the petitioner estimated that he spent "close to $60,000," "over $40,000," and "4 to 5 hundred dollars a week." Mrs. Thomson estimated that her husband spent $20,000 or $30,000 on Blount's behalf. Mr. Cheeks offered no estimate concerning the amount spent by Mr. Thomson. The lack of adequate substantiation has created confusion as to whether some travel and entertainment expenses were properly attributable to Blount or to the hardware sales business. His hardware sales business required extensive travel to every city and village in Florida, locations to which he also claims to have traveled on Blount's behalf.He admitted that he sometimes mixed hardware sales activities and Blount activities while on the same trip and that some *529 of the documentation which he submitted to this Court pertained to his hardware business. The Thomsons testified that they tried to separate any Blount expenses from hardware sales expenses. The petitioner testified that he entered only the hardware sales expenses in the logbook from which his wife debited the travel account. He said that if he charged a nonbusiness expense, he mentioned it to his wife, so that when she paid the charge bill, she did not debit the travel account for that portion of the bill representing nonbusiness items. Yet, their system was not completely successful, for at the end of 1973, Mrs. Thomson reduced total debits to travel by only $452.53 in order to eliminate nonbusiness charges mistakenly debited to the travel account. She was unable to recall whether such adjustment pertained to Blount expenses or what expenses were included in it. The Thomsons' inability to distinguish between Blount expenses and hardware sales expenses is further illustrated by the fact that some of the travel and entertainment expenses which the petitioner now claims were incurred on behalf of Blount were deducted as hardware sales expense on the petitioners' returns for *530 1973 and 1974. For example, the petitioner deducted the cost of one airline ticket to Costa Rica as a travel expense and $300 as a Costa Rican selling expense on the return for 1973. He also deducted all or nearly all payments for tickets on Air Florida. Now he claims that the Costa Rican expenses and some of the Air Florida travel were attributable to Blount.Similarly, the petitioner claimed a deduction for depreciation on certain automobiles, but the record reflected a great deal of confusion over what cars he actually owned in 1973 and 1974, what cars were used in the hardware sales business, and what cars were allegedly used for Blount. Furthermore, the petitioner's failure to seek reimbursement from Blount for his travel and entertainment expenses allegedly incurred on its behalf casts further doubt on his claim. [4] Between January and August of 1974, Blount reimbursed others engaged in its business for their travel expenses. Mr. Cheeks received reimbursement for at least some of his travel expenses. The petitioner did not explain why he failed to seek reimbursement of his travel expenses when Blount could have paid him and when Blount was reimbursing others for similar *531 expenditures. Additionally, Blount did reimburse him for the $30,000 which he actually advanced to Blount and the $1,500 which he paid to its attorneys in 1973. Also, Blount provided cars to its working officers. The petitioner was initially Blount's executive vice president and treasurer. The record contains no indication that he relinquished both of these positions, and we are left to wonder why Mr. Thomson did not utilize the company cars for his many alleged trips. In addition, the petitioner's contention that he was to "pay" for his Blount stock by incurring travel expenses on its behalf is not reflected in any of the corporate books and records. Indeed, such records tend to refute his assertion. Blount's general journal for its taxable year 1974, as well as its trial balance sheets for its taxable years 1973 and 1974, show that only Mr. McCarty paid *532 for his stock. The equity of all other shareholders, including the petitioner, was evidenced by a $7,800 "stock subscription receivable" entered as an offsetting debit to the $10,000 common stock account. Mr. Cheeks, president of Blount, testified that the petitioner never paid for his stock; Mr. Cheeks did not refer to the alleged arrangement whereby the petitioner was to receive stock in exchange for services or his payment of travel expenses on Blount's behalf. Nor do the Blount books reflect any such travel expenses as paid by it or on its behalf. The fact that Blount's records reflect no capital contributions by the petitioner indicates that any travel expenses he may have incurred were not considered by those involved with Blount as contributions to Blount's capital. See Spangler v. Commissioner,32 T.C. 782, 797 (1959), affd. 278 F. 2d 665 (4th Cir. 1960); Acorn Refining Co. v. Commissioner,34 B.T.A. 566, 571 (1936)[5] (in determining whether payments to a corporation, or improvements constructed on its behalf, were capital contributions, courts looked at how the transaction was treated on corporate books). *533 Finally, many of the trips which the petitioner claims were taken on behalf of Blount appear to have had personal purposes. He included in his estimate of Blount expenses the cost of a trip to New Orleans, which he claimed was undertaken to induce Mr. McCarty to invest in Blount. However, Mrs. Thomson accompanied her husband on this trip, and she and Mrs. McCarty are sisters. The petitioner also included in his estimate the cost of many trips to Lake Wales, Fla. While Blount had a project there, Lake Wales was also the home of the Thomsons' daughter and her family, and the McCartys also lived in Lake Wales after Mr. McCarty became involved in Blount. Mrs. Thomson accompanied her husband on at least some of the trips to Lake Wales, and the Thomsons occasionally visited their grandchildren. Lastly, the petitioner testified that it was "very possible" that he and his family vacationed in Costa Rica during 1973 or 1974, and it is possible that the expenses now claimed as contributions to Blount's capital included the cost of such vacations. The fact that the petitioner may have engaged in some activities on Blount's behalf incident to trips which were personal in nature is insufficient *534 to convert the cost of such travel into contributions to Blount's capital. Cf. sec. 1.162-2(a), (b)(1), Income Tax Regs.
The petitioners argue that even if they failed to prove each of the travel expenses claimed by them, we should apply the doctrine of Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), and find that they did incur substantial travel expenses on behalf of Blount and allow them to treat that amount as basis in the Blount stock. Since section 274(d) is not applicable in this case, we are not prevented from applying the Cohan doctrine by reason of the enactment of that provision. Sanford v. Commissioner,50 T.C. 823 (1968), affd. per curiam 412 F. 2d 201 (2d Cir. 1969). However, for us to make a Cohan estimate, we must be convinced from the record that the petitioner incurred travel and entertainment expenses on Blount's behalf in atleast the amount allowed in such estimate. Unless we have that assurance, "relief to the taxpayer would be unguided largesse." Williams v. United States,245 F. 2d 559, 560 (5th Cir. 1957). On this record, we are not convinced that an estimate in any amount *535 is proper. Accordingly, we must conclude and hold that the petitioner has failed to prove that he had any basis in the Blount stock. In light of this holding, we need not determine the amount of his proportionate share of Blount's net operating loss for its taxable year ending August 31, 1974, computed without regard to the basis limitation contained in section 1374(c)(2). Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during 1974, unless otherwise indicated.↩
2. All references to a Rule are to the Tax Court Rules of Practice and Procedure.↩
3. Sauvigne' v. Commissioner,T.C. Memo. 1971-30. This disposition makes it unnecessary for us to consider the Commissioner's argument that future services cannot constitute payment or part payment for the issuance of shares of a corporation under Florida law. See 18 Fla. Stat. Ann. sec. 607.054↩(6) (West 1976).
4. Cf. Grey v. Commissioner,10 T.C. 590, 597 (1948) (amount reimbursed sufficient evidence to prove amount of expense incurred); Lang Chevrolet Co. v. Commissioner,T.C. Memo. 1967-212↩ (failure to seek reimbursement indicated intent to bear meal and lodging expenses personally).
5. Williams v. Commissioner,T.C. Memo. 1981-54↩.